IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

LAMOUNT GREEN,

                          Plaintiff,              Civil Action No.
                                                  9:10-CV-1268 (NAM/DEP)

          v.

JAMES CONLEN, LAWRENCE BOUDREAU,
T.W. ARNOLD, JEFFREY OSBORN, and
LANNY JENSEN, Deputy Sheriffs, Albany
County Sheriff's Department,

                          Defendants.

_____

APPEARANCES:                                      OF COUNSEL:

<u>FOR THE PLAINTIFF</u>:

LAMOUNT GREEN, *Pro se*
08-A-4432
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13201

<u>FOR THE DEFENDANTS</u>:

OFFICE OF ROBERT P. ROCHE              ROBERT P. ROCHE, ESQ.
36 South Pearl Street
Albany, New York 12207

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Lamount Green, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983, claiming that while he was confined as a pretrial detainee in Albany County, the defendants violated his civil rights. The sole claim contained within plaintiff's complaint, as amended, alleges a violation of his Eighth Amendment right to be free from cruel and unusual punishment based upon his assertion that he was beaten by several Albany County prison guards. As relief, plaintiff seeks one million dollars in compensatory damages and one million dollars in punitive damages against the five remaining defendants.

Currently pending before the court is defendants' motion for summary judgment seeking dismissal of plaintiff's complaint. In their motion, defendants contend that based upon the credible evidence in the record no reasonable factfinder could conclude that they violated plaintiff's Eighth Amendment rights. For the reasons set forth below, I recommend that defendants' motion be denied.

I.   BACKGROUND[1]

---

[1]       In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities

Plaintiff is currently a prison inmate entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), and confined within the Auburn Correctional Facility. *See* Dkt. No. 65.  According to the plaintiff, on November 2, 2007, while confined as a pretrial detainee within the Albany County Correctional ("ACCF"), he received a "call out" for court.  Second Amended Complaint (Dkt. No. 45) ¶ 14.  Plaintiff was taken to the ACCF intake area where he was placed in handcuffs and shackles by defendant Conlen and another Albany County deputy.  *Id.*  When he asked why he was being transported to the Albany County Courthouse, plaintiff alleges, he was misled into believing that it was for an attorney conference.  *Id.*

Upon his arrival at the Albany County Courthouse, located at 6 Lodge Street, Albany, New York, plaintiff was placed in a holding cell, where he laid down and slept until being awoken by a court officer.  Second Amended Complaint (Dkt. No. 45) ¶ 15.  At the direction of that officer, plaintiff exited the holding cell and was escorted toward the elevator.  *Id.*  Instead of proceeding to the elevator, however, plaintiff was directed to turn right and was led to an office area where defendant Conlen was standing.  *Id.*  When

_____

resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

plaintiff proceed toward defendant Conlen, the two exchanged words.  As

plaintiff turned to walk away, Conlen grabbed him by the back of his jumpsuit

and pulled Green toward him.  *Id.* at 16.  Defendant Conlen then questioned

plaintiff about accusations of abuse at the hands of sheriff's deputies that

Green had made in court the day before.  *Id.*

    According to plaintiff, defendant Conlen advised him that he was being

"re-arrested" and reached for a fingerprint kit.  *Id.*  Plaintiff objected and

refused to cooperate with Conlen in allowing his fingerprints to be taken.  *Id.*

Defendant Conlen then escorted plaintiff to a segregated holding cell where,

moments later, defendants Boudreau, Arnold, Osborn, and Jensen appeared

and proceeded to physically attack Green, utilizing pressure point holds to

cause plaintiff to fall to the floor face and head first, knocking out four of his

teeth, and causing him to lose consciousness.  *Id.* at ¶ 17.  Plaintiff describes

the alleged attack as follows:

> Upon Deputy Conlen return with others in toll [sic], as he (Conlen)
> unlocked the cell.  Deputy Arnold belittlingly commented "I was
> only a buck fifty wet" – as Deputy Osborn rushed and "Roughly"
> grabed me by the back of my neck, (between the Jaw-Bone and
> neck influxing extremely intense pain) and the buttock part of my
> jumpsuit pulling me to my feet, within the same motion of officer
> Osborn enactment – other Deputies swarmed me.
>
> As the unwishful occasion begin, I became airborone with left
> ankle being twissed [sic] upward, a fist being drilled (not punched,

-4-

drilled) into my left side (below chest area).  While pressure enlarged at my knee and shoulder blaid [sic], "All of the above" caused my entire physical to shake uncontrollably.  As the highly unbearable occasion cause [sic] me to mush the half eatin sandwich (I was still grasping) in my hand, in the mix of their fierce actions, one of the Deputies behind me shouted someone get the finger print kit and board.  At that moment all pressure stopped except that of the ankle twissing [sic] and hand around the back of my neck, once three Deputies simultaneously released their grip to act on shouted request I "freefell" from the grip choaking [sic] the back of my neck.

Green's Decl. (Dkt. No. 45) ¶¶ 2-3.

When plaintiff regained consciousness, he found himself in a hospital bleeding from his forehead and mouth and surrounded by officers.  Second Amended Complaint (Dkt. No. 45) ¶ 18.  Plaintiff alleges that thereafter defendant Conlen and Albany County Sergeant Kovacs attempted to cover up the attack by fabricating prison disciplinary charges as well as criminal complaints against him.  *Id.* at ¶ 18.

The only point of agreement between the parties regarding the salient facts is that plaintiff refused to be fingerprinted on the day in question.  In all other respects, the defendants' rendition of the events differs markedly from plaintiff's version.  An incident report prepared by defendant Conlen, dated November 1, 2007, reflects that on that date he was assigned as the second floor jailer at the Albany County Justice Building and was observing several

inmates, including Green, who were in a holding cell, when he heard a scraping sound and noticed plaintiff moving his arms up and down the door frame of the holding cell while his handcuffs were affixed to his wrists.  *See* Defendants' Exh. F (Dkt. No. 53) (Incident Report).  When defendant Conlen directed plaintiff to stop, he did so.  *See id.*

As soon as defendant Conlen exited the holding cell, the scraping noises resumed, and defendant Conlen observed plaintiff making the same motions.  *See id.*  For a second time defendant Conlen instructed plaintiff to stop, inspected the damage to the door frame, which included scratches and indentations, and notified Sergeant Mariani, who photographed the damage. *See id.*  The incident report further recounts that Green was removed from the holding cell and returned to the first floor holding area, and arrested the following day, on November 2, 2007, on charges of criminal mischief relating to the damage, as well as for resisting arrest and obstructing governmental administration based upon his refusal to be fingerprinted.[2]  *See id.; see also* Defendants' Exh. F (Dkt. No. 53) Conlen Memo. of 11/2/07; Defendants' Exh. F (Dkt. No. 53) Arrest Report and Incident Report.

---

[2]      Plaintiff was arraigned in Albany City Court on those charges on November 5, 2007, at which time bail was set at $10,000.00, and a physical examination of plaintiff was ordered.  *See* Defendants' Exh. F (Dkt. No. 53) Securing Order.

According to a memorandum dated November 2, 2007, prepared by defendant Conlen for Sergeant Mariani, on that date plaintiff was brought to the Judicial Center to be processed for the criminal mischief occurring the previous day, and when instructed to permit his fingerprints to be taken Green failed to cooperate. *See id.* Defendants' Exh. F (Dkt. No. 53), Conlen Memo. of 11/2/07. The memorandum further reflects that after Conlen advised Sergeant Mariani of plaintiff's refusal to be fingerprinted, the sergeant spoke with Green in an effort to gain his cooperation, without success. *See id.* At approximately 12:00 p.m. on that date, defendants Osborn, Arnold, Jensen, Boudreau, and Conlen entered Green's cell and, following his persistent refusal of the directive that he submit to fingerprints, he squeezed a peanut butter and jelly sandwich in his hands and clenched them. See Defendants' Exh. F (Dkt. No. 53) Conlen Memo. of 11/2/07 and Arnold Mem. of 11/2/07. As a result, Green was restrained, various pressure points were applied by the deputies, and his fingerprints were then taken. *See generally* Defendants' Exh. F. (Dkt. No. 53). Plaintiff calmed down, and when the deputies left him in the cell he was "fine" with no signs of physical injury. *See generally id.* In his report of the incident to his supervising captain, Sergeant Mariani noted that no physical force, other than restraint

and pressure point tactics, were used upon plaintiff to gain his cooperation in the fingerprinting, and that when he left the cell, Green was standing. *See* Defendants' Exh. F. (Dkt. No. 53) Mariani Memo. of 11/02/07.

While performing a routine cell check at approximately 1:18 p.m. on that date Deputy Duda, who is not a defendant in this action, encountered plaintiff, who stated that he was not feeling well and wanted medical attention.[3] *See* Defendants' Exh. F. (Dkt. No. 53) Duda Memo. of 11/2/07. Deputy Duda notified Sergeant Mariani of the request, and both officers spoke with Green. Neither deputy observed any sign of physical injury, nor did they observe any blood in his cell. *See id.* The Albany emergency medical service ("EMS") was called. *See id.* When Deputy Duda returned to Green's cell approximately four minutes later, he found Green lying on the floor with a knot on his head; additionally, for the first time, Deputy Duda noticed blood on the cell wall. *See id.* Deputy Duda removed the restraints from plaintiff, who appeared to be conscious but was unresponsive. *See id.* EMS personnel arrived at approximately 1:22 p.m., and plaintiff was transported to the Albany Medical Center Hospital ("AMCH") emergency room for evaluation. *See* Defendant's Exh. B (Dkt. No. 52-2). Based upon

---

[3]     Plaintiff denies ever speaking with Duda. *See* Plaintiff's Response to Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 67-2) ¶ 8.

these facts, in his report to his supervising officer, Sergeant Mariani

concluded that Green inflicted wounds upon himself for unknown reasons.

Defendants' Exh. F (Dkt. No. 53) Mariani Memo. of 11/2/07.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on October 25, 2010.  Dkt. No. 1.

Based upon an initial review of plaintiff's complaint and *in forma pauperis*

application, the court ordered dismissal of all claims against defendant

Sergeant Kovac, without prejudice, as well as of plaintiff's claims relating to

false misbehavior reports and criminal prosecution.  Dkt. No. 4.  Following

defendants' service of an answer and the court's issuance of a mandatory

pretrial scheduling order, plaintiff filed an amended complaint, Dkt. No. 22,

which was accepted for filing by the court, Dkt. No. 25.  Soon thereafter,

plaintiff sought and was granted leave to file a second amended complaint,

the operative pleading now before the court.  *See* Dkt. Nos. 30, 43, 45.

 On August 26, 2011, following the close of discovery, defendants

moved for summary judgment dismissing plaintiff's single remaining claim

against them.  Dkt. No. 51.  In their motion, defendants essentially argue that

the credible evidence in the record fails to support plaintiff's Eighth

Amendment excessive force claim against them.  With the filing of opposition

papers by the plaintiff, *see* Dkt. No. 67, and a reply on behalf of the

defendants, Dkt. No. 70, defendants' motion is now ripe for determination

and has been referred to me for the issuance of a report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District

of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106

S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion

Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material," for

purposes of this inquiry, if it "might affect the outcome of the suit under the

governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also

Jefferys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing

*Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 240, 106 S. Ct. at 2510.  Though *pro se* plaintiffs are entitled to special solicitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *But see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the nonmoving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

-11-

B.    Excessive Force

At the heart of plaintiff's complaint is a claim of excessive force based upon the November 2, 2007 incident.  This claim is brought under the Eighth Amendment, which forbids punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble*, 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290-91 (1976); *see also Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1076, 1085 (citing, *inter alia*, *Estelle*).[4] While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).

---

[4]    As a pretrial detainee at the relevant times, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences.  *Benjamin v. Fraser*, 343 F.3d 35, 49-50 (2d Cir. 2003).  In the wake of the Second Circuit's decision in *Caiozzo v. Koreman*, however, it seems clear that a claim alleging a serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether it is brought under the Eighth or Fourteenth Amendment.  *See Caiozzo*,  581 F.3d 63, 72 (2d Cir. 2009).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley*, 475 U.S. at 319, 106 S. Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999).  The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7, 112 S. Ct. 995, 998-99 (1992) (applying *Whitley* to all excessive force claims); *Whitley*, 475 U.S. at 320-21, 106 S. Ct. at 1085 (quoting *Johnsvon v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom.*, *John v. Johnson*, 414 U.S. 1033, 94 S. Ct. 462 (1972)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord*, 554 F. 3d 255, 268 (2d Cir. 2009) (citing *Hudson*, 503 U.S. at 7-8, 112 S. Ct. at 999 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).  As was recently emphasized by the United States Supreme Court in *Wilkins v. Graddy*, however, after *Hudson*, the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force

-13-

applied was nontrivial.   ___ U.S. ___, 130 S. Ct. 1175, 1179 (2010) (per

curiam).  Accordingly, when considering the subjective element of the

governing Eighth Amendment test a court must be mindful that the absence

of serious injury, though relevant, does not necessarily negate a finding of

wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to
> cause harm, contemporary standards of decency always are
> violated . . . .  This is true whether or not significant injury is
> evident.  Otherwise, the Eighth Amendment would permit any
> physical punishment, no matter how diabolic or inhuman, inflicting
> less than some arbitrary quantity of injury.

*Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000 (citations omitted); *see also*

*Romaine v. Rewson*, 140 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) (Kahn, J.)

*Velasquez v. O'Keefe*, 899 F. Supp. 972, 973 (N.D.N.Y. 1995) (McAvoy,

C.J.).  Even a *de minimis* use of physical force can constitute cruel and

unusual punishment if it is "repugnant to the conscience of mankind."

*Hudson*, 503 U.S. at 9-10, 112 S. Ct. at 1000 (citations omitted).

     With its focus on the harm done, the objective prong of the inquiry is

contextual and relies for a point of reference upon "contemporary standards

of decency."  *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8, 112 S.

Ct. at 1000) (internal quotations omitted)).  When addressing this component

of an excessive force claim under the Eighth Amendment calculus, the court

-14-

can consider the extent of the injury suffered by the inmate plaintiff.  While

the absence of significant injury is certainly relevant, it is not dispositive.

*Hudson*, 503 U.S. at 7, 112 S. Ct. at 999.  The extent of an inmate's injury is

but one of the factors to be considered in determining if a prison official's use

of force was "unnecessary and wanton"; courts should also consider the need

for force, whether the force was proportionate to the need, the threat

reasonably perceived by the officials, and what, if anything, the officials did to

limit their use of force.  *Whitley*, 475 U.S. at 321, 106 S. Ct. at 1085 (citing

*Johnson*, 481 F.2d at 1033).  "But when prison officials use force to cause

harm maliciously and sadistically, 'contemporary standards of decency are

always violated . . . .  This is true whether or not significant injury is evident.'"

*Wright*, 554 F. 3d at 268-69 (quoting *Hudson*, 503 U.S. at 9, 112 S. Ct. at

1000).

That is not to say "every malevolent touch by a prison guard gives rise

to a federal cause of action."  *Griffin*, 193 F. 3d at 91 (citing *Romano v.

Howarth*, 998 F.3d 101, 105 (2d Cir. 1993)); *see also Johnson*, 481 F.2d at

1033 ("Not every push or shove, even if it later may seen unnecessary in the

peace of a judge's chambers, violates a prisoner's constitutional rights.").

Where a prisoner's allegations and evidentiary proffers, if credited, could

-15-

reasonably allow a rational factfinder to find that corrections officers used force maliciously, however, summary judgment dismissing an excessive force claim is inappropriate.  *Wright*, 554 F.3d at 269 (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary judgment dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury")) (other citations omitted).

Though not entirely clear, it appears that defendants' motion seeking judgment as a matter of law is premised upon their contention that the alleged assault could not have occurred as plaintiff contends because 1) the alleged date of the occurrence in plaintiff's original complaint was October 26, 2007, but was later claimed in his amended pleading to be November 2, 2007;[5] 2) he did not make a claim relating to the events occurring on

---

[5]     Plaintiff responds to defendants' allegation that he changed the date of the alleged occurrence from October 26, 2007 to November 2, 2007 to yield "to the overwhelming reliability of contemporaneously made records", Roche Aff. (Dkt. No. 52) ¶ 4, by stating that something did happen to him on October 26, 2007 to make him remember that date – according to defendants' counsel all of Green's property was lost on that date – while apparently acknowledging he made a mistake about the date of the event at issue in this lawsuit.  *See* Green's Decl. (Dkt. No. 67-3) ¶ 14.

November 2, 2007 until almost a year later when submitting a notice of intention to file a claim with the New York Court of Claims; 3) there is no evidence in the medical records, or his previous filings, which supports plaintiff's claim that he was beaten and as a result lost four teeth; and, 4) the records maintained by defendants regarding the incident demonstrate that plaintiff's injury was self-inflicted.  A review of the record before the court, however, reveals that the conflicting accounts offered by plaintiff and defendants squarely raise issues of credibility and presents questions of fact for resolution by a jury and inappropriate for determination by the court on a motion for summary judgment.  *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia, Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513).

To put plaintiff's claim of excessive force in context, though not at issue in this action, plaintiff maintains that the beating he sustained on November 2, 2007 was in retaliation for a complaint registered by him regarding abuse during a previous court appearance.  In this regard, plaintiff claims that he made this allegation while appearing in court before "Justice Herrick".  An undated transcript attached to plaintiff's submission does, in fact, reflect that plaintiff complained to the judge before whom he was appearing that he had

been "man handled" and his hand had been broken and his shoulder

dislocated.  Plaintiff's Rule 7.1(a)(3) Statement of Undisputed Facts (Dkt. No.

67-1) ¶ 2; *see also* Plaintiff's Exh. B-1 (Dkt. No. 67-6).  Plaintiff alleges that

he was taken to the Albany County Courthouse on November 1, 2007 for a

bail hearing, evidently on an unrelated matter, and was placed in a holding

area with ten or more black inmates all wearing yellow jump suits, and denies

that he perpetrated the alleged damage to the cell, suggesting instead that

this charge was fabricated in retaliation for plaintiff's earlier complaint that he

had been subjected to the use of excessive force.  Plaintiff's Local Rule

7.1(a)(3) Statement of Undisputed Facts (Dkt. No. 67-1) ¶¶ 1, 3; *see also*

Plaintiff's Exh. C1 (Dkt. No. 67-6).  Moreover, plaintiff disavows knowing that

he was being arrested for additional criminal charges on November 2, 2007

until the time that defendant Conlen directed that he submit to fingerprinting;

according to plaintiff, he was simply informed that he was being taken to the

court.

Painting an entirely different picture of the day in question, defendants

maintain that plaintiff inflicted the head injury upon himself on November 2,

2007, and then concocted his constitutional claims almost three years after

the fact.  In further support of this theory, upon which their motion is

bottomed, defendants contend that plaintiff did not assert his claim that he was subjected to excessive force and lost four teeth on November 2, 2007 until December 2008 when he filed a claim with the New York Court of Claims.  Roche Aff. (Dkt. No. 52) ¶ 7; *see also* Defendant's Exh. C (Dkt. No. 52-3).  Because plaintiff filed that claim with the state, defendant still did not become aware of his allegations at that time, and it was not until he commenced this action that they first learned of his allegations.  Additionally, defendants make much of plaintiff's notice of intention to file a claim, which is stamped as having been received by the New York State Attorney General Claims Bureau on January 7, 2008; in it, plaintiff complains that he was beaten at the hands of New York City Police officers "in the projects where [he] live[s]" on October 9, 2007.  *See* Defendants' Exh. 1 (Dkt. No. 52-1).  In defendants' view this document, which was filed just two months after the events at issue in this action and makes no reference to having been assaulted on November 2, 2007, belies plaintiff's present claim.

Plaintiff, on the other hand, argues that he complained immediately after the November 2, 2007 incident and notified defendants on several occasions before November 2008 of the allegations made in his complaint. And, in fact, there is at least a modicum of evidence to support this assertion.

*See* Green Aff (Dkt. No. 67-3) ¶ 4.  As Green emphasizes, and as is evidenced by the hospital emergency room medical records, he advised medical providers at AMCH of the occurrence at the courthouse on November 2, 2007.  *Id.* Plaintiff's Exh. D2 (Dkt. No. 67-6).

Indeed, the parties' conflicting versions of what occurred on the date in question are squarely presented in the records generated from plaintiff's visit to the emergency room at AMCH.  On the one hand, a nurse's note made during that visit recounts that plaintiff was found banging his head against a pole and had an abrasion with a hematoma to the center of his forehead, noting that plaintiff was awake and alert and holding conversations with law enforcement at 4:45 p.m. on November 2, 2007, approximately an hour and a half after his arrival at the hospital.[6]  *See* Plaintiff's Exh. D1 (Dkt. No. 67-6). In contrast, the history noted in a radiology report from the visit indicates that plaintiff had been complaining of chest pain before becoming unresponsive and that, while there was no acute intrathoracic disease shown, the X-ray results indicated a cortical irregularity along the posterior aspect of the left third rib, which could represent a fracture.[7]  *See* Plaintiff's Exh. D2 (Dkt. No.

---

[6]    Plaintiff denies self-inflicting any injury.  Plaintiff's Decl. (Dkt. No. 67-4) ¶ 9.

[7]    Consistent with this statement, a supplemental report, which appears to have been prepared by a deputy assigned to investigate the incident, but whose signature is

67-6).

The emergency room records regarding plaintiff's visit also indicate that before being taken for an X-ray, as well as a CT scan of his head and C-spine, plaintiff was not responding to medical care providers.  *See id.* Following those tests, plaintiff was responsive and reported to the medical care provider that the guards beat him because he refused to give fingerprints as he was angry that new charges were being lodged against him; plaintiff also complained that the sides of his jaw, where he was held down by the guards, hurt and that his gold teeth were missing.  *See* Plaintiff's Exh. D2 (Dkt. No. 67-6).  Plaintiff was diagnosed by the emergency room physician as suffering syncope, a head injury with a contusion to the forehead, and conversion disorder.[8]  *See id.*  Green was instructed to follow

_____

illegible, notes that after being forcibly fingerprinted, plaintiff was left alone in the cell and that later during a routine cell check a transportation deputy observed Green lying on the floor complaining of chest pain.  Defendants' Exh. F (Dkt. No. 53) Supplemental Report dated 11/2/07.  The deputy preparing the report responded that day to both the holding cell and the AMCH, taking photographs of the scene as well as of plaintiff's injuries.  *See id.*  The report also notes that while in the emergency room Green stared at the ceiling and would not answer questions or respond to physical stimuli administered by the medical staff.

[8]     Syncope is a temporary loss of consciousness, commonly referred to as fainting.  DORLAND'S MEDICAL DICTIONARY 1845 (31st ed. 2007).  Conversion disorder is a mental disorder characterized by conversion symptoms, including loss or alteration of voluntary motor or sensory function suggesting physical illness, having no demonstrable physiological basis and whose psychological basis is suggested by, among other things, stress.  *Id.* at 556.  However, the symptoms of the disorder are "neither intentionally produced nor feigned, and are not limited to pain. . .." *Id.*

up with his primary medical care provider in four to five days, as needed, and

with a dentist regarding his teeth.  *See id.*  Significantly, however, there is no

notation in either the EMS record or the AMCH emergency records to show

that an injury to Green's mouth or face was observed.

Also included within plaintiff's submission in opposition to defendants'

motion are plaintiff's dental records, revealing that on December 31, 2009,

two years after the alleged incident, it was noted that plaintiff suffered decay

and swollen gums, and extraction was recommended for teeth numbers 5, 7,

8, 9, and 10.[9]  *See* Plaintiff's Exhs. (Dkt. No. 67-6) DOCCS Dental Treatment

Record.  While photographs contained in the record before the court depict a

contusion and abrasion to plaintiff's forehead, there is no obvious injury to his

mouth or face; other photographs also show modest splotches and/or

spatters of blood on the floor, concrete walls, and a pole dividing a toilet area

in what appears to be a holding cell.  *See* Defendants' Exh. F (Dkt. No. 56-1);

*see also* Plaintiff's Exhibits (Dkt. No. 67-6).

---

[9]      Defendants somewhat cryptically "concede Mr. Green claimed loss of his
'gold' teeth at AMCH.  Wonder they never documented his claim or objective evidence of
physical encounter as the etiology of 'the loss'."  Roche Aff. (Dkt. No. 70-1) ¶ 16.  At this
juncture, affording plaintiff the benefit of all favorable inferences that can be drawn from
the evidence in the record, as the court must, since Green was reporting to the medical
staff attending him in the emergency room the events that had occurred and the injuries
he sustained at the hands of the officers, the court can infer that the loss of his teeth,
which Green identified at the time, also resulted from the incident.

Plaintiff also contends that he complained of the assault just three days later, on November 5, 2007, during his arraignment in city court, referring to an alleged audio recording of the proceeding, which is not included in the record, as well as the November 5, 2007 securing order issued by that court which indicates that a medical examination of the plaintiff was ordered. Green Decl. (Dkt. No. 67-3) at ¶ 4; *see also* Plaintiff's Local Rule 7.1(a)(3) Statement of Undisputed Material Facts (Dkt. No. 67-1) ¶ 6.  Additionally, attached to plaintiff's submission are 1) a letter, which appears to be dated "10.07", addressed to the grievance coordinator complaining of excessive force and cruel and unusual punishment by defendant Conlen, and other officers, at the county courthouse on November 2, 2007, which Green alleged resulted in pain in his chest and head and the loss of his front teeth, Plaintiff's Exh. F2 (Dkt. No. 67-6); 2) a letter to the grievance coordinator, the date of which is not readily apparent, complaining of official misconduct involving what appears to be a separate incident allegedly occurring on January 23, 2008, during which he was allegedly dragged by his leg shackles through the hallways of the county courthouse and thereafter denied requested medical attention, Plaintiff's Exh. F3 (Dkt. No. 67-6); 3) a handwritten document labeled "grievance form", also undated, complaining that he had been

-23-

requesting, but was denied, grievance forms for two days and also that he

had requested mental help but his name was instead placed on the library

list, *id.* at Exh. F4; 4) a letter dated January 23, 2008, to "Ms Ann" of the

Inmate Services Unit ("ISU") at ACCF, apparently relaying the incident he

claimed occurred that day at the courthouse and requesting information

about "pressing charges", *id.* at Exh. I;[10] and, 5) a letter dated January 30,

2008 addressed "to who it may concern", alleging that he was assaulted by

deputy sheriffs at 6 Lodge Street on November 2, 2007 as well as January

23, 2008, and requesting an investigation of the cameras located in the

county courthouse. *Id.* at Exh. F5. [11]  In that letter, plaintiff asserts that on

November 2, 2007 five deputies hurt him and "put him unconscious", and that

an ambulance transported him to the Albany Medical Center as a result of the

---

[10]     Green states that he made this complaint to ISU staff because he did not receive responses to the two grievances he claims to have filed earlier that month.  *See* Green Decl. (Dkt. No. 67-3) ¶ 18 (referring to Plaintiff's Exhibits F2-F3).

[11]     In support of defendants' motion, ACCF Superintendent Thomas J. Wigger has submitted a declaration explaining that the video for the facility is only preserved when there is a plausible or reasonable likelihood of a claim known to facility staff.  Wigger Decl. (Dkt. No. 51-4) ¶ 3.  Superintendent Wigger states further that since plaintiff did not reveal his accusations against defendants until his notice of intention to file a claim filed with the New York Court of Claims in December of 2008, a year after the alleged occurrence, there was no longer any video available to preserve.  *See id.*  It should be noted, moreover, that even in December 2008 defendants were not aware of plaintiff's allegation since the notice was filed with the state and not the county.   *See id.*  In fact, it was not until three years later, when plaintiff filed his complaint, that ACCF employees became aware of plaintiff's claim.  *See id.* at ¶ 4.

attack.  That letter is notarized by Edward C. Kennedy, dated January 31, 2008, and at the bottom of the second page appears to be directed to various DOCCS and other governmental officials.  *See id.*  Plaintiff claims that he made seven copies of this document and submitted it to the facility grievance office as well as the six authorities identified therein, as evidenced by a "photocopy and form request form" showing that on January 31, 2008 he requested one copy of a two-page notice of intent and also seven copies of "paper legal."  Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 67-1) ¶ 8; *see also* Plaintiff's Exh. F5 (Dkt. No. 67-6).  Plaintiff believes that the January 30, 2008 letter was never received by the intended recipient "due to County Jail access to manipulate protocol."  Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 67-1) ¶ 8. Though no longer in issue in this action, plaintiff maintains that within five or six days thereafter, he was subjected to retaliation including false disciplinary charges.  *See* Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 67-1) ¶¶ 9 - 13.

ACCF Chief Corrections Officer Brian Mooney, who is responsible for maintaining all grievances, directly contradicts plaintiff's assertions, stating that he has searched the records of the facility for 2007 and 2008 and found

none for Lamount (a.k.a. Lamont) Green.[12]  Mooney Aff. (Dkt. No. 51-3) ¶ 1;

Mooney Aff. (Dkt. No. 70-2) ¶¶ 3, 11-12.  Chief Mooney states further that he

is responsible for all internal records at the facility, including tier logs,

disciplinary files, kitchen logs, ISU files and SHU logs, and has general

oversight of CMS records consistent with HIPPA regulations.  *Id.* at ¶ 3.  A

review of the relevant records from November 2, 2007 to August 18, 2007,

when plaintiff was transferred into DOCCS custody, reveals no sign of injury

to plaintiff's mouth or claimed loss of teeth, nor do kitchen logs suggest that

plaintiff had requested any type of special diet to accommodate a sore or

sensitive mouth.[13]  *Id.* at ¶ 4.

    In addition to the grievances filed and the letters directed to DOCCS

officials, and others, plaintiff asserts that he filed two notices of intention to

file a claim with the New York Court of Claims, both of which appear to be

dated July 18, 2012, but were notarized by Edward C. Kennedy on December

18, 2007.  Plaintiff's Exhs. A1 and A (Dkt. No. 67-6).  One of these

documents refers to a claim arising out of an unrelated incident occurring on

---

[12]     Though raised as a first affirmative defense in their answer to the second
amended complaint, *see* Answer (Dkt. No. 46) ¶ 5, in their motion defendants have not
asserted failure to exhaust administrative remedies as a basis for dismissal of plaintiff's
complaint.

[13]     Plaintiff responds by stating that he never knew he was eligible for special
meals.  Plaintiff's Decl. (Dkt. No. 67-4) ¶ 4.

October 9, 2007 when Green was allegedly assaulted by New York City

Police Officers and is stamped received by the New York State Office of the

Attorney General on January 7, 2008.  *See* Plaintiff's Exh. A (Dkt. No. 67-6).

The second refers to another occasion on which plaintiff claims to have been

physically attacked, on October 26, 2007; unlike the first notice of intention,

there is no indication that it was received by the New York Attorney General's

Office as it does not bear a stamp acknowledging its receipt.[14]  *See* Plaintiff's

Exh. A1 (Dkt. No. 67-6).  It seems to be plaintiff's claim that his second notice

of intention referred to the November 2, 2007 assault, which he mistakenly

identified as occurring on October 26, 2007.  *See* Green's Decl. (Dkt. No. 67-

3) ¶ 14.  With regard to those two notices, plaintiff claims that on January 2,

2008 he gave them to the ACCF Block Officer on 2-East, badge #358, and

signed the "money release form", and the officer took plaintiff's open

envelope.  Green's Decl. (Dkt. No. 67-3) ¶ 10.  Again, however, plaintiff

claims that these documents were not delivered to where they were

---

[14]      Plaintiff apparently also filed a notice of claim with the state alleging he was physically assaulted by sheriff's deputies at the courthouse on October 26, 2007 and detailing the events at issue in this lawsuit; that notice was received by the Attorney General on December 5, 2008.  *See* Defendants' Exh. C (Dkt. No. 52-3) at ¶¶ 2-5.  In that notice plaintiff also claims that all of his property came up missing from the facility safe on that date.  *Id.* at ¶ 8.  The notice alleges that plaintiff filed a notice of intention to file a claim on January 7, 2008, which is somewhat consistent with plaintiff's contentions with respect to this motion.  *Id.* at ¶ 11.

intended.[15]  *Id.* at ¶ 11; *see also* Plaintiff's Exhs. A1 and A (Dkt. No. 67-6).

Finally, plaintiff also asserts that he previously advised defendants' counsel, in writing, of his attempts to file grievances regarding the November 2, 2007 occurrence on November 10, 2007, January 23-24, 2008, and January 30, 2008.  *See* Plaintiff's Exh. F1 (Dkt. No. 67-6).

Though far from overwhelming and fraught with inconsistencies and/or apparent mistakes, when affording Green all favorable inferences that may be drawn from the evidence in the record, I conclude at this juncture that a reasonable factfinder could find in plaintiff's favor.  The emergency room records show not only that within hours of the fingerprinting incident plaintiff made a claim that he was assaulted by officers and claimed to have lost his teeth, but also confirms that he sustained injuries to his head and chest area, which conceivably are consistent with his allegation that a sheriff's deputy struck his left side below his chest area with a closed fist, and that he ultimately plummeted to the floor head first.  The supplemental report prepared by the deputy assigned to investigate the matter could also be

---

[15]    Disputing plaintiff's purported proof of prior notice, Chief Mooney labels Plaintiff's Exhibit A1, the alleged notice of intention relating to the assault in question – but erroneously identifying the date as October 26, 2007– as a forgery, pointing out the obvious error on the date appearing adjacent to plaintiff's signature and the remarkable similarity of the second page of this notice of intention to that regarding the October 9, 2007 incident.  Mooney Aff. (Dkt. No. 70-2) ¶¶ 5-9.

interpreted to provide some corroboration for plaintiff's claims, to the extent that it confirms that after the defendants left Green's holding cell he was lying on the floor complaining of pain in the chest area.  Similarly, the securing order issued upon plaintiff's arraignment for the criminal charges arising out of the November 2, 2007 incident, indicating that a physical examination of plaintiff was ordered, lends some support to plaintiffs's assertion that he complained of the incident during his subsequent arraignment.

While defendants deny receiving any grievances or complaints from Green regarding the facts at issue in this lawsuit until in or about October 2010, when he filed this lawsuit, Green's letter dated January 30, 2008, wherein he complaint that five deputies hurt him and rendered him unconscious and in need of medical attention, was notarized on January 31, 2008, and as such provides further evidence of the fact that plaintiff made these same allegations in relatively close temporal proximity to their alleged occurrences.  In sum, though vigorously disputed by defendants, the record provides at least modest support for plaintiff's claim that he was subjected to the excessive use of force on November 2, 2007.

In sum, after careful review of the record before the court, I find that the conflicting evidence raises questions of credibility and fact inappropriate for

summary determination.  *See Gillard v. Rosati*, No. 9:08-CV-1104, 2011 WL
4402131 (N.D.N.Y. Aug. 22, 2011) (Peebles, M.J.) (finding summary
judgment dismissing plaintiff's assault claims inappropriate in view of
conflicting accounts given by the parties), *report and recommendation
adopted*, 2011 WL 4344061 (N.D.N.Y. Sep. 14, 2011) (Kahn, J.); *see also
Lewis v. Johnson*, No. 9:08-CV-482, 2010 WL 3785771, at *7 and n.12.
(N.D.N.Y. Aug. 5, 2010) (Baxter, M.J.) ("[G]iven that issues of credibility
should not be resolved on a summary judgment motion, this court cannot
conclude that no rational juror could find that defendants . . . violated
plaintiff's Eighth Amendment rights. . ..") (citing cases), *report and
recommendation adopted*, 2010 WL 3762016 (N.D.N.Y. Sep. 20, 2010)
(McAvoy, S.J.).[16]   For these reasons, I recommend that defendants' motion
be denied.

IV.   SUMMARY AND RECOMMENDATION

    At the heart of plaintiff's claim in this action is his allegation that he was
subjected to excessive force by corrections officials while being detained at
the ACCF because he refused to permit his fingerprints to be taken, and as a
result suffered injuries to his head and lower chest area, as well as the loss

---

    [16]    Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

of four teeth.  In view of the conflicting accounts given by the parties

regarding those claims, as well as the contradictory evidence within the

record, I am constrained to conclude that the grant of summary judgment

dismissing plaintiff's excessive force cause of action would be inappropriate.

Accordingly, it is therefore hereby respectfully,

RECOMMENDED, that defendants' motion for summary judgment

dismissing plaintiff's complaint (Dkt. No. 51) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the

parties may lodge written objections to the foregoing report.  Such objections

shall be filed with the Clerk of the Court within FOURTEEN days of service of

this report.  FAILURE TO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72;

*Roland v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is further hereby ORDERED that the clerk of the court serve a copy of

this report and recommendation upon the parties in accordance with this

court's local rules.

Dated:     February 24, 2012
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

-31-



Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Gary GILLARD, Plaintiff,
v.
Craig ROSATI, Gregory Beecher, Michael Paige,
Jeremy Burch, Kelly Doyle, Richard Lapan, Arthur
Harris, Andrew Frazier, Michael Hoy, Keith Hendry,
Peter Besson, Fisher Nesmith, Ken Verio, Michele
Czerwinski, Howard Silverberg, William Redmond [FN1],
and Roberta Labrum, Defendants.

FN1. In his amended complaint plaintiff names
"William Redmen" as a defendant. Dkt. No. 33;
*see also* Dkt. No. 35. Although defendants
identify this defendant as both "William
Redman" and "William Redmond" in their
motion, *see, e.g.,* Dkt. No. 82–2 at p. 18, service
was accepted by "William Redmond", *see* Dkt.
No. 41, the name reflected on the court's docket
sheet. Accordingly, I will refer to this defendant
by that name.

Civil Action No. 9:08–CV–1104 (LEK/DEP).

Aug. 22, 2011.
Gary Gillard, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Roger W. Kinsey, Esq., Assistant Attorney
General, of Counsel, Albany, NY.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.
    **\*1** Plaintiff Gary Gillard, a New York State prison
inmate who is proceeding *pro se* and *in forma pauperis,*
has commenced this action pursuant to 42 U.S.C. § 1983,
claiming deprivation of his civil rights.[FN2] Although his
initial complaint in this matter was significantly more
far-reaching his claims have been winnowed substantially,

and now stem principally from two incidents involving the
alleged use of excessive force by prison personnel and the
failure of prison medical employees to provide him with
adequate treatment for his resulting injuries. As relief,
plaintiff seeks compensatory and punitive damages
ranging into the hundreds of millions of dollars against the
seventeen named defendants.

    FN2. Since 2000, plaintiff has proven himself to
    be a prodigious litigator in the federal courts.
    During that period Gillard has filed nine civil
    rights suits in this district, four of which were
    commenced in 2009, and has initiated eight other
    similar civil rights actions in the Eastern District
    of New York and two in the Western District of
    New York. *See* http://www.pacer.gov/. Based
    upon the court's review of the dockets in the
    previously filed lawsuits, it appears that at least
    two were dismissed for failure to state cause of
    action. *See Gillard v. Mahoney, et al.,* Civil
    Action No. 2:00–CV–5420 (E.D.N.Y.) Dkt. No.
    3; *Gillard v. Kirwin,* Civil Action No.
    2:01–CV–2125 (E.D.N.Y.) Dkt. No. 109. Since
    the commencement of this lawsuit, yet another
    complaint filed by Gillard has been dismissed for
    failure to state a claim, *see Gillard v. Gaffney,*
    No. 2:00–CV–5945 (E.D.N.Y.) Dkt. No. 131,
    thereby potentially subjecting him to the three
    strikes provision of 28 U.S.C. § 1915(g).

    Currently pending before the court is a motion
brought by defendants requesting summary judgment
dismissing plaintiff's remaining claims. In their motion,
defendants argue that no reasonable factfinder could
conclude that they violated plaintiff's Eighth Amendment
rights, and further that they are shielded from suit in their
official capacities under the Eleventh Amendment, and as
individuals by qualified immunity. For the reasons set
forth below, I recommend that defendants' motion be
granted in part, but otherwise denied.

*I. BACKGROUND*[FN3]

    FN3. In light of the procedural posture of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

case, the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS") (formerly known as the New York State Department of Correctional Services, or the "DOCS"). *See generally* Am. Compl. (Dkt. No. 33). Plaintiff is currently confined within the Attica Correctional Facility, *see* Dkt. No. 74, although at the times relevant to his claims he was incarcerated within the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. *See generally* Am. Compl. (Dkt. No. 33). At the heart of plaintiff's claims are incidents occurring at Great Meadow on or about September 17, 2007 and January 31, 2008.

A. *September 17, 2007 Incident*

On September 17, 2007, Gregory Beecher, a corrections officer at Great Meadow, ordered the plaintiff to proceed to an interview room to meet with Corrections Lieutenant Peter Besson in order to discuss a pending grievance filed by Gillard. Beecher Decl. (Dkt. No. 82–3) ¶ 5; Besson Decl. (Dkt. No. 82–6) ¶ 18; Gillard Decl. (Dkt. No. 87) ¶ 4. Plaintiff alleges that he was accompanied to the interview room by defendant Beecher, who became hostile and threatening during the escort, giving Craig Rosati, another corrections officer, "the signal to move into action against" Gillard. Gillard Decl. (Dkt. No. 87) ¶ 4. According to plaintiff he was then kicked, punched, and kneed by defendant Rosati, while defendant Beecher stood idly by. *Id.*

In their motion papers defendants offer starkly contrary accounts of the events of September 17, 2007. While defendant Rosati admits to conducting a pat and frisk of the plaintiff, and escorting the plaintiff to the interview, he denies having assaulting him. Rosati Decl. (Dkt. No. 89) ¶¶ 5–9.[FN4] In contrast to plaintiff's claims that defendant Beecher stood by during the assault, that defendant claims his role was limited to providing Gillard with a pass and that he had no involvement in escorting plaintiff as alleged. Beecher Decl. (Dkt. No. 82–3) ¶ 6.

Beecher also denies assaulting or threatening the plaintiff in any way.[FN5] *Id.* at ¶ 7.

FN4. The declaration of Craig Rosati as well as another given by defendant Roberta Labrum are cited in defendants' Local Rule 7.1(a) (3) Statement, *see* Dkt. No. 82–1, filed in support of this pending motion, but were not included in their motion submission. When advised of that fact by the court, defendants' counsel submitted those declarations, both of which are dated from July 2010. Dkt. Nos. 88, 89. While plaintiff objects to the court's consideration of these documents, *see* Dkt. No. 90, I recommend that they be considered, in the court's discretion, given that it appears likely the failure to submit them with the original motion was a mere oversight. *Cooper Industries v. Agway, Inc.,* 987 F.Supp. 92, 101 (N.D.N.Y.1997) (recognizing court's discretion under N.D.N.Y.L.R. 7.1(b)(3) to accept or reject untimely affidavits).

FN5. Plaintiff's escort to the interview room by defendant Rosati was necessitated in light of his refusal to obey the order to go speak with defendant Besson. Besson Decl. (Dkt. No. 82–6) ¶ 19.

*2 When questioned regarding the grievance which was to be the subject of the interview, plaintiff became uncooperative and, according to Besson, refused to answer any of his questions. Besson Decl. (Dkt. No. 82–6) ¶ 20. Plaintiff stated to Besson that he had been beaten on the way to the interview room, although Besson did not observe any obvious injuries to the plaintiff. *Id.* at ¶¶ 21–22. According to Besson, he attempted to have plaintiff examined by medical personnel in light of his allegations of being beaten, but plaintiff refused the opportunity. *Id.* at ¶ 24. At the conclusion of the session, plaintiff was personally escorted by Corrections Lieutenant Besson back to his cell. *Id.* at ¶ 23.

Plaintiff also spoke with Corrections Lieutenant Keith Hendry concerning the alleged incident. Am. Compl. (Dkt. No. 33) ¶ 100. Plaintiff claims that defendant Hendry ignored his requests for medical attention and disregarded

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

his complaints.[FN6] *Id.*

> **FN6.** Although defendants' Local Rule 7.1.(a)(3) Statement makes reference to a declaration given by Lieutenant Hendry, that declaration is not included among the motion papers now before the court.

Plaintiff was examined by defendant Michael Hoy, a corrections sergeant, and Roberta Labrum, a nurse, on September 20, 2007. Hoy Decl. (Dkt. No. 82–11) ¶¶ 5–6; Labrum (Dkt. No. 88) ¶¶ 4–5. According to those individuals, no visible bruising was observed during that examination. *See id.* Plaintiff refutes those findings, claiming them to have been false and misleading, designed to cover up the beating and his resulting injuries, including the inability to stand, walk, or lift anything due to pain in his arm, ankle, back, and neck. Gillard Decl. (Dkt. No. 87) ¶ 6.

### B. *January 31, 2008 Incident*

On January 31, 2008, while in his cell, plaintiff was instructed by Corrections Officers Jeremy Burch and Kelly Doyle to dress and participate in an interview by a corrections sergeant. Am. Compl. (Dkt. No. 33) ¶ 84. Upon entering the office of Corrections Sergeant Andrew Frazier plaintiff was asked about his grievances and whether Gillard smelled alcohol on Frazier's breath. *Id.* at ¶¶ 85–86. During the session, defendant Jeremy Burch slammed plaintiff's face into a cabinet, and defendant Andrew Frazier threatened to break both of plaintiff's legs and arms if he continued to submit grievances. *Id.* at ¶¶ 86–87. Plaintiff was then struck in the face by defendant Frazier and on the right side of the head and in his jaw area by Jeremy Burch, while defendant Kelly Doyle punched him in the back; all three persisted, striking the plaintiff in the face, neck, back, ribs, and lower back areas. *Id.* at ¶ 87. Plaintiff was then returned to his cell where he requested medical attention from Corrections Officer Richard Lapan, who refused to provide emergency treatment despite the fact that plaintiff was throwing up blood and had bruises on his face. *Id.* at ¶ 90.

On the following day, defendant Fisher Nesmith, a physician's assistant at Great Meadow, went to plaintiff's cell in response to Gillard's complaint of injuries,

examined him, and arranged for him to be moved to the medical area. Nesmith Decl. (Dkt. No. 82–10) ¶ 4; Kinsey Aff. (Dkt. No. 82–13) Exh. K, p. 27 (hereinafter cited as "Medical Records p. ___"). At that time, plaintiff was treated for a possible minor contusion to the right orbital area, under his right eye. Nesmith Decl. (Dkt. No. 82–10) ¶ 5. Thereafter, plaintiff was examined by Corrections Sergeant Hoy and Nurse Labrum, also on February 1, 2008. Hoy Decl. (Dkt. No. 82–11) ¶ 8; Labrum Decl. (Dkt. No. 88) ¶ 7. X-rays taken on that day were negative. Hoy Decl. (Dkt. No. 82–11) ¶ 9; Labrum Decl. (Dkt. No. 88) ¶ 8.

### C. *Medical Treatment*

**\*3** On September 20, 2007, three days after the first claimed assault, plaintiff was examined by Corrections Officer Michael Hoy and Nurse Roberta Labrum. Medical Records pp. 7–8. Although plaintiff complained of back pain, neither Hoy nor Labrum observed any injuries. *See id.* The next day, plaintiff was prescribed a lumbar corset. *Id.; see also* Silverberg Decl. (Dkt. No. 82–8) ¶ 9.

Defendant Howard Silverberg, a physician at Great Meadow, examined the plaintiff on September 25, 2007. *Id.* at ¶ 10. On that date Dr. Silverberg prescribed a back brace and the medication Flexeril for pain. *Id.; see also* Medical Records pp. 7–8.

On October 5, 2007, plaintiff requested x-rays and a neck brace, complaining of back pain. Medical Records p. 5. He also stated that he had just seen a doctor, started medication, and underwent magnetic resonance imaging ("MRI") testing, but nonetheless desired to see a doctor again. *Id.* Medical staff instructed plaintiff to take the medication "as ordered" and "give them a chance to work." *Id.*

Approximately two months later, on December 18, 2007, Dr. Silverberg prescribed an ankle brace and lumbar corset for the plaintiff. Medical Records pp. 25–26. Defendant Silverberg also recommended that plaintiff see an orthopedic surgeon. *Id.* at 23. That suggestion, however, was rejected by other prison medical personnel, who recommended that plaintiff first undergo physical therapy. *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

Plaintiff contends that after the purported January 31, 2008 assault, he advised defendant Lapan that he needed to see medical staff because he was vomiting blood. Am. Compl. (Dkt. No. 33) ¶ 90; Gillard Decl. (Dkt. No. 87) ¶ 8. Plaintiff was seen by Physician's Assistant Fisher Nesmith the next day. Medical Records p. 27; Nesmith Decl. (Dkt. No. 82–10) ¶ 4. During that visit Gillard complained of "vague pain" because a "sgt hit him last PM," and defendant Nesmith treated plaintiff for a possible minor bruise under his right eye. Medical Records p. 27; Nesmith Decl. (Dkt. No. 82–10) ¶¶ 4–5. Plaintiff also received an x-ray. Medical Records pp. 22, 27. Plaintiff was informed on February 15, 2008 of the x-ray results, which were "essentially normal." Silverberg Decl. (Dkt. No. 82–8) ¶ 21; Medical Records pp. 22, 27. Based upon those results, medical staff recommended that plaintiff use an air cast or undergo physical therapy for his ankle pain. Silverberg Decl. (Dkt. No. 82–8) ¶ 21; Medical Records p. 11. An ankle cast was subsequently prescribed for the plaintiff on March 31, 2008 by Dr. Silverberg. Silverberg Decl. (Dkt. No. 82–8) ¶ 22.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on October 10, 2008. Dkt. No. 1. Since its inception, the matter has had a extensive procedural history which need not be recounted in full for purposes of placing the pending motion in context.

The operative pleading of the plaintiff now before the court is a revised amended complaint filed on November 16, 2009. See Dkt. No. 33. In that document, which is essentially excerpted from a prolix amended complaint earlier filed with the court, plaintiff names seventeen of the seventy-three defendants originally sued, both in their official and individual capacities, and asserts claims of excessive force, failure to intervene, deliberate medical indifference, and verbal harassment, all in violation of the Eighth Amendment. Am. Compl. (Dkt. No. 33).

**\*4** Following service, joinder of issue, and the completion of pretrial discovery, defendants moved on September 7, 2010 for summary judgment dismissing plaintiff's claims against them. Dkt. No. 82. In their motion defendants argue that 1) the record fails to support plaintiff's Eighth Amendment claims; 2) defendants

Harris, Paige, Czerwinski, Redmond, Nesmith, Hoy, Labrum, Besson, Hendry, and Lapan were not personally involved in any alleged civil rights deprivation; 3) defendants are entitled to Eleventh Amendment immunity from suit in their official capacities; and 4) as individuals they are entitled to qualified immunity. Id. Defendants' motion, which plaintiff has opposed, see Dkt. No. 87, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). See also Fed.R.Civ.P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; see also Jefferys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 240, 106 S.Ct. at 2510. Though pro se plaintiffs are entitled to special solicitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); But see Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether pro se plaintiff understood nature of summary judgment process).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the nonmoving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Failure to File a Proper Local Rule 7.1.(a)(3) Statement*

**\*5** The court's rules provide that a party opposing a motion for summary judgment

shall file a response to the [moving party's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the nonmovant contends are in dispute in separately numbered paragraphs.

N.D.N.Y.L.R 7.1(a)(3). This rule, which is typical of similar rules from many courts, serves to assist the court in identifying material issues in a case and determining whether they are genuinely disputed. *See Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000).

The consequences of a failure to adhere to this meaningful rule are potentially significant. By its terms, Local Rule 7.1(a)(3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's

failure to respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 U.S. Dist. LEXIS, 1264122, at \*1 (Aug. 22, 200) (McCurn, S.J.) (listing cases) [FN7]; *see also Monahan,* 214 F.3d at 292 (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). As a counterbalance to this often-fatal deficiency, a court has broad discretion to overlook a party's failure to comply with its local rules. *Travelers Indemnity Co. of Ill. v. Hunter Fan Co.,* No. 99 CIV 4863, 2002 U.S. Dist. LEXIS 1238, 2002 WL 109567, at \*7 (S.D.N.Y. Jan.28, 2002) (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001)).

FN7. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. \*

\*Editor's Note: Attachments of Westlaw case copies deleted for online display.

While in opposing defendants' motion plaintiff has filed a document entitled "Plaintiff's Statement of Disputed Factual Issues," plaintiff's submission fails to satisfy the requirements of Local Rule 7.1(a)(3). Although plaintiff's statement includes seven separately numbered paragraphs, those paragraphs do not directly respond or correspond to the forty-four separately numbered paragraphs contained in Defendants' Local Rule 7.1(a)(3) Statement. *See* Plaintiff's Opposition (Dkt. No. 87) pp. 5–6 (unnumbered).[FN8] Additionally, plaintiff has neglected to include any citations to the record in his Local Rule 7.1(a)(3) Statement, as also required by the rule.

FN8. The pages of plaintiff's opposition are not numbered. The court will therefore refer to the page numbers as filed and reflected on the court's docket.

Despite these deficiencies, plaintiff has submitted a twelve-paragraph affidavit detailing the incidents of alleged unconstitutional conduct. *See* Gillard Decl. (Dkt. No. 87) pp. 1–4. The last line of that affidavit is a declaration, signed by plaintiff, that "under the penalty of perjury ... the foregoing is true and correct." [FN9] *Id.* at p. 4. Further, plaintiff's response is accompanied by affidavits from three witnesses to the incident allegedly occurring on

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

January 31, 2008. *Id.* at pp. 12–14. Accordingly, in deference to his *pro se* status, and given that he has actively opposed defendants' motion and that it is fairly clear from his submissions which facts are disputed, though without minimizing the importance of Local Rule 7.1(a)(3), I recommend against deeming plaintiff to have admitted the facts set forth in Defendants' 7.1 Local Rule 7.1(a)(3) Statement.[FN10]

> FN9. Plaintiff's submission substantially complies with 28 U.S.C. § 1746, which provides that
>
>> [w]herever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: ... "I declare (or certify, verify, or state) under penalty of perjury the foregoing is true and correct. Executed on (date). (Signature)".
>
> 28 U.S.C. § 1746(2).

> FN10. This recommended disposition is particularly appropriate in this case since it does not appear that defendants' motion was accompanied by the required notice to plaintiff of the consequences of his failure to properly respond in opposition to the motion. *See* N.D.N.Y.L.R. 56.2.

C. *Eleventh Amendment Immunity*

**\*6** Plaintiff's complaint, as amended, makes clear that he is asserting claims against the defendants both individually and in their official capacities. In their motion, defendants seek dismissal of Gillard's claims against them in their official capacities, asserting their entitlement to Eleventh Amendment immunity. Defendants' Memorandum (Dkt. No. 82–2) p. 18.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities when the essence of the claim involved is one against a state as the real party in interest. *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his or her official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[FN11] *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

> FN11. By contrast, the Eleventh Amendment does not serve as an impediment to suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30–31, 112 S.Ct. at 364–65.

Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, and that plaintiff's damage claims against the defendants in their capacities as state officials be dismissed.[FN12]

> FN12. Among the relief sought in plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

complaint, as amended, is the issuance of an injunction. Claims against the defendants in their official capacities for injunctive relief are not subject to dismissal under the Eleventh Amendment. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 58, 116 S.Ct. 1114, 1124, 134 L.Ed.2d 252 (1996). Nonetheless, it is likely that any request for injunctive relief in this case is destined to be rejected as moot in light of the fact that Gillard is no longer incarcerated at Great Meadow, where the events giving rise to his claims occurred. It is well settled in this circuit that transfer from a prison facility moots an action for injunctive relief against the transferring facility. *Prins v. Coughlin,* 76 F.3d 504, 506 (2nd Cir.1996) (citing *Young v. Coughlin,* 866 F.2d 567, 568 n. (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989), and *Beyah v. Coughlin,* 789 F.2d 986, 988 (2d Cir.1986)); *Candelaria v. Greifinger,* No.96–CV–0017, 1998 WL 312375, at *2 (N.D.N.Y. June 8, 1998) (Pooler, J. and Scanlon, M.J.).

D. *Personal Involvement*

In their motion certain of the individuals sued by the plaintiff, including defendants Harris, Paige, Nesmith, Besson, Hendry, Lapan, Hoy, Labrum, Czerwinski, and Redmond, urge dismissal of plaintiff's claims against them based upon the lack of any showing of their involvement in the constitutional violations alleged in his complaint.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Gatson v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffit v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), cert denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). As the Supreme Court has noted, a defendant may only be held accountable for his or her actions under section 1983. *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1927, 1952 (2009). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

1. *Defendant Czerwinski*

**\*7** Defendant Michelle Czerwinksi, a nurse administrator at Great Meadow, argues that she was not personally involved in any alleged unconstitutional conduct and that she is named as a defendant solely due to her place in the prison medical staff chain of command. Plaintiff counters that defendant Czerwinski is liable for having ignored letters regarding his alleged medical mistreatment.[FN13] *See, e.g.,* Am. Compl. (Dkt. No. 33) ¶¶ 106, 109.

> FN13. Plaintiff's motion response fails to address defendants' lack of personal involvement arguments. However, affording the plaintiff the special solicitude that he deserves as a *pro se* litigant, when assessing the issue of personal involvement I have examined the allegations contained in his amended complaint, which is a verified pleading, *see Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment.") (citation omitted), for sufficiency.

As a supervisor, defendant Czerwinski cannot be held liable for damages under section 1983 solely by virtue of her position; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. In order to establish her liability, plaintiff must prove that she 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

The record is devoid of any evidence of defendant Czerwinski's direct involvement in the events giving rise to plaintiff's claim. Her role appears to be limited to the receipt of two letters from the plaintiff which she failed to answer. It is well-established that without more, "mere receipt of letters from an inmate by a [supervisory official] regarding a medical claim is insufficient to constitute personal liability." *Gonzales v. Wright,* No. 9:06–CV–1424 (JMH), 2010 U.S. Dist. LEXIS 15953, at *28, 2010 WL 681323, at *10 (N.D.N.Y. Feb.22, 2010) (Hood, J.) (citations omitted); *see also Booker v. Doe,* No. 9:06–CV–73 (GLS), 2008 U.S. Dist. LEXIS 76413, at *22, 2008 WL 4527601, at *7 (N.D.N.Y. Sept.30, 2008) (Sharpe, J.) ("It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement.").

In light of the lack of evidence of defendant Czerwinski's personal involvement in the constitutional violations alleged, I recommend that this defendant's motion for summary judgment be granted and plaintiff's claims against her be dismissed.

2. *Defendant Redmond*

Defendant William Redmond, another nurse administrator, also argues that he also was not personally involved in any alleged unconstitutional conduct and that he is named as a defendant due solely to his supervisory position. Like Czerwinski, plaintiff claims that defendant Redmond ignored letters regarding his alleged medical mistreatment. *See* Am. Compl. (Dkt. No. 33) ¶ 115.

**\*8** For purposes of the personal involvement analysis defendant Redmond's circumstances are factually distinguishable from those of defendant Czwerinski. In addition to the letters sent by the plaintiff, the record contains two memoranda authored by defendant Redmond, dated November 13, 2007 and March 10, 2008, in which he explained and defended plaintiff's treatment. *See* Kinsey Decl. (Dkt. No. 82–13) Exh. J. It has been held that personal liability may lie where a "supervisor's 'involvement went beyond merely the receipt of complaint letters,' to 'responding, explaining the treatment and defending the institution.' " *Woods v. Goord,* No. 01 Civ.

3255(SAS), 2002 U.S. Dist LEXIS 7157, at *27–31, 2002 WL 731691, at *7–9 (S.D.N.Y. Apr.23, 2002) (Schendlin, J.) (internal citations omitted); *see also Rashid v. Hussain,* No. 95–Civ. 676, 1997 U.S. Dist. LEXIS 16132, at *9–10, 1997 WL 642549, at *3 (N.D.N.Y. Oct. 15, 1997) (Pooler, J.).

Drawing all inferences and resolving ambiguities in plaintiff's favor, I am unable to conclude that no reasonable factfinder could hold defendant Redmond accountable for the constitutional deprivations allegedly suffered by the plaintiff. Accordingly, I recommend that his motion seeking summary judgment based upon lack of personal involvement be denied.

3. *Defendants Hoy and Labrum*

Although defendants Michael Hoy and Roberta Labrum argue that they were not personally involved in any unconstitutional conduct, they admit to having conducted a medical examination of plaintiff on September 20, 2007, three days after the first purported assault, and another on February 1, 2008, one day after the second alleged assault. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 82–1) ¶¶ 12, 26. Based upon these circumstances a reasonable factfinder could conclude that they were personally involved in defendants' indifference to plaintiff's medical condition. As such, I recommend that their summary judgment on the ground of lack of personal involvement be denied.

4. *Defendant Nesmith*

Defendant Fisher Nesmith, who, as was previously noted, serves as a physician's assistant at Great Meadow, admits to having examined the plaintiff on February 1, 2008, one day after the second claimed assault. Nesmith Decl. (Dkt. No. 82–10) ¶ 4. On that occasion, defendant Nesmith treated plaintiff for a possible minor bruise under plaintiff's right eye. *Id.* at ¶ 5. Based upon his role, a jury could find that defendant Nesmith was personally involved in plaintiff's medical care and defendants' deliberate indifference toward his medical needs. Accordingly, I recommend that defendant Nesmith's motion for summary judgment on the ground of lack of personal involvement be denied.

5. *Defendants Harris and Paige*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

Defendants Arthur Harris and Michael Paige, two DOCCS corrections officers stationed at Great Meadow, argue that they were not personally involved in any constitutional deprivation alleged because the only accusation against them is that they were in charge of opening plaintiff's cell door so that he could be taken to the meeting that led to the alleged assault on January 31, 2008. In support of his claim against those defendants, Gillard argues that they purposefully opened his cell door so that defendants Burch, Doyle, and Frazier could assault him. Am. Compl. (Dkt. No. 33) ¶ 91; Gillard Decl. (Dkt. No. 87) ¶ 8. Defendants Harris and Paige flatly dispute this claim. Harris Decl. (Dkt. No. 82–4) ¶ 11; Paige Decl. (Dkt. No. 82–9) ¶ 8. Neither of those defendants was present in or near plaintiff's cell at the time of his alleged assault; instead, both were present in a control bubble, responsible for controlling cell doors and access to and from cell blocks, among other things. Harris Decl. (Dkt. No. 82–4) ¶¶ 5 and 6; Paige Decl. (Dkt. No. 82–9) ¶¶ 5 and 6. Both deny that the purpose of opening plaintiff's cell door was to facilitate an assault. Harris Decl. (Dkt. No. 82–4) ¶ 11; Paige Decl. (Dkt. No. 82–9) ¶ 8.

**\*9** Plaintiff's allegations that when defendants Harris and Paige performed their duty to open plaintiff's cell door they knew an assault would follow is wholly speculative. No evidence has been offered from which a reasonable jury could find their complicity in the alleged use of excessive force against the plaintiff. Plaintiff's unsupported conclusion regarding those defendants' motives is insufficient to raise an issue of fact precluding the grant of summary judgment. *Franconero v. Universal Music Corp.,* No. 02 Civ.1963(BSJ), 2011 WL 566794, at \* 5 (S.D.N.Y. Feb.11, 2011) (citation omitted). I therefore recommend that plaintiff's claims against those defendants be dismissed for lack of personal involvement.

### 6. *Defendants Besson and Hendry*

Defendants Besson and Hendry, a corrections lieutenant and a corrections sergeant, respectively, argue that they are named as defendants due solely to their positions in the prison chain of command. They contend that the record now before the court fails to establish a tangible connection between their actions and plaintiff's constitutional claims sufficient to establish their personal involvement, and therefore seek summary judgment with regard to plaintiff's claims against them.

Defendant Besson has submitted a declaration in which he admits to having interviewed the plaintiff on September 17, 2007 and again on February 12, 2008. Besson Decl. (Dkt. No. 82–6) ¶¶ 5, 18. Plaintiff fails to dispute defendant Besson's claim that Gillard could not offer any information or witnesses regarding the January 31, 2008 incident. *See id.* at ¶¶ 6–7. Since the January 31, 2008 incident represented an alleged constitutional violation which was not ongoing, but instead of finite duration, and hence defendant Besson was not in a position on February 12, 2008 to prevent or end the deprivation, there is no basis for finding requisite personal involvement on his part in connection with the January 31, 2008 incident to support a finding of liability.

Defendant Besson also had involvement with regard to the earlier matter by attempting to interview Gillard on September 17, 2007 regarding a complaint previously filed. Besson Decl. (Dkt. No. 82–6) ¶ 18. After failing to cooperate, plaintiff reported that he had been beaten on the way to the interview room. *Id.* at ¶¶ 20–21. Defendant Besson, however, observed no injuries, nor was he given any other reason to believe plaintiff's accusations, and plaintiff refused the opportunity to be examined by medical personnel regarding the matter. *Id.* at ¶¶ 22–25. Based upon these limited circumstances, I recommend a finding that plaintiff's has failed to establish a basis for defendant Besson's liability.

Defendant Hendry falls into a different category. Although his affidavit is referenced in defendant's Local Rule 7.1(a)(3) Statement, it is not currently before the court. Measured against this void is plaintiff's assertion that defendant Hendry refused to provide medical assistance and disregarded his complaint after he was informed of the September 17, 2007 incident. *See* Am. Compl. (Dkt. No. 33) ¶ 100. I therefore recommend denial of defendant Hendry's motion for summary judgment based upon the lack of personal involvement in light of his potential participation in the alleged deliberate indifference to plaintiff's serious medical needs.

### 7. *Defendant Lapan*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

**\*10** Defendant Richard Lapan is a corrections officer at Great Meadow. Lapan Decl. (Dkt. No. 82–7) ¶ 1. Plaintiff claims that defendant Lapan denied his request for medical assistance when defendant Lapan returned plaintiff to his cell following the January 31, 2008 incident. Gillard Decl. (Dkt. No. 87) ¶ 8. Defendant Lapan admits working at Great Meadow on January 31, 2008 and in his declaration does not deny that plaintiff requested medical attention without success. *See generally* Latham Decl. (Dkt. No. 82–7). At a bare minimum, the issue of whether, as contended by the plaintiff, Gillard requested but was denied medical attention for his injuries from defendant Latham constitutes an issue of fact concerning his involvement which cannot be resolved on motion for summary judgment. Accordingly, I recommend denial of defendant Latham's motion for summary judgment based upon lack of personal involvement.

E. *Excessive Force*

At the heart of plaintiff's amended complaint are claims of excessive force based upon the September 2007 and January 2008 incidents. These claims are brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1085 (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or

maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–99, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnsyon v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1972)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson,* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. —— U.S. ——, 130 S.Ct. 1175, 1179, 175 L.Ed.2d 995 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

**\*11** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated .... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *see also Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.) *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. at 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies for a point of

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

reference upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining if a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated.... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000).

That is not to say "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffin,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.3d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously, however, summary judgment dismissing an excessive force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary judgment dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")) (other citations omitted).

**\*12** The basis for defendants' assertion that they are entitled to judgment as a matter of law dismissing plaintiff's excessive force claims is unclear, particularly in

view of the fact-laden nature of the inquiry ordinarily surrounding the objective and subjective prongs of the Eighth Amendment test and the conflicting accounts given regarding the relevant events. Looking first at the September 17, 2007 incident, plaintiff contends the he was kicked, punched, and kneed by defendant Rosati. *See, e.g.* Gillard Decl. (Dkt. No. 87) ¶ 4; *see also* Am. Compl. (Dkt. No. 33) ¶¶ 97–98. By contrast, defendant Rosati denies assaulting the plaintiff, stating instead that his conduct on that date was limited to a pat and frisk of the plaintiff. Rosati Decl. (Dkt. No. 89) ¶ 6, 9. These conflicting accounts squarely raise an issue of credibility, presenting a question of fact for resolution by a jury and inappropriate for determination by the court on a motion for summary judgment. *See Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) (citing, *inter alia, Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513).

Plaintiff's claims surrounding the January 31, 2008 incident implicate defendants Burch, Doyle, and Frazier. Gillard Decl. (Dkt. No. 87) ¶ 7 and Am. Compl. (Dkt. No. 33) ¶¶ 84–88. Those three defendants are accused of having applied excessive force on that date in an effort to coerce the plaintiff to recant an earlier complaint regarding defendant Paige. *See id.*

For his part defendant Frazier maintains that he was not working at Great Meadow on January 31, 2008 and therefore was not present on the day of the alleged assault. Frazier Decl. (Dkt. No. 82–12) ¶ 7; *see also* Kinsey Aff. (Dkt. No. 82–13) Exhs. C and F. The exhibits submitted, however, are somewhat equivocal concerning whether defendant Frazier was actually working on the day in question. The Security Supervisor Chart for January 31, 2008, offered in support Frazier's contention, lists an "a. Frazier" accompanied with the handwritten text "645" and an illegible handwritten notation. Kinsey Aff. (Dkt. No. 82–13) Exh. C. At the end of the day, a jury undoubtedly will be called upon to resolve the issue of whether defendant Frazier was working and involved in the alleged assault on January 31, 2008. Resolution of that issue cannot be accomplished by the court at this procedural juncture; instead, the conflicting accounts raise an issue credibility precluding the grant of summary judgment. *In re Dana Corp.,* 574 F.3d 129, 152 (2d Cir.2009) (quoting Fed. R.Civ. P. 56(e) Advisory Committee Note (1963)).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

Defendant Burch and Doyle take a different tact in defense of plaintiff's claims. They do not appear to dispute his claim that an altercation occurred on the date in question, instead arguing that x-rays of the plaintiff taken one day after of the purported assault were negative for injuries and, accordingly, plaintiff's allegations " 'fail to shock the conscience ...'." Defendants' Memorandum (Dkt. No. 82–2) at pp. 9–10. Assuming this to be true, the inquiry nonetheless is not ended, since even if plaintiff suffered only minimal injuries, a rational factfinder could determine that defendants Burch and Doyle acted maliciously and sadistically by assaulting plaintiff to coerce him to recant his complaint.[FN14] *See Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (summary judgment inappropriate in an excessive force claim even though "medical records after the ... incident ... indicate[ ] only a slight injury.").

> FN14. Defendants cite to *Kerman v. City of New York,* 261 F.3d 229 (2d Cir.2001), for that proposition that "plaintiff will not prevail in a claim for excessive force when 'contrasting accounts ... present factual issues as to the degree of force actually employed and its reasonableness.' " Defendants' Memorandum (Dkt. No. 82–2) pp. 6–7, 10. Contrasting accounts of an incident such as that at bar clearly present an issue of material fact making summary judgment inappropriate. *See Rule,* 85 F.3d at 1011. Moreover, *Kerman* does not support defendants' proposition. In *Kerman,* the Second Circuit held that under Rule 50 of the Federal Rules of Civil Procedure judgment as a matter of law in a jury trial was *inappropriate* in an excessive force claim where "contrasting accounts of both [plaintiff's] and [defendant's] conduct ... present factual issues as to the degree of force actually employed and its reasonableness." *Kerman,* 261 F.3d at 239.

*13 Having determined that genuine issues of material fact exist surrounding plaintiff's excessive force claims, I recommend that the portion of their motion seeking dismissal of those claims as a matter of law be denied.

F. *Failure to Intervene*

In addition to asserting that various defendants beat him, plaintiff alleges that other defendants, while not direct participants, observed the assaults and failed to act. A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02–CV–6257Fe, 2004 U.S. Dist. LEXIS 28225, 2004 WL 2202645, at *4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Vill. of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to the level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, inter alia, *Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

In their motion defendants do not directly address plaintiff's failure to intervene claims. The sufficiency of those claims, however, is indirectly implicated, including in the portion of the motion addressing the question of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

personal involvement.

*1. Defendant Beecher*

Defendant Beecher contends that the only allegations against him are for verbal harassment, claims that are not cognizable under § 1983. Factually, defendant Beecher maintains that his role in the relevant events was limited to instructing the plaintiff to go to the interview room on September 17, 2007 to see defendant Besson. Beecher Decl. (Dkt. No. 82–3) ¶ 5. Defendant Beecher states that it was his "job to give the inmate a pass and not escort[ ] him personally." [FN15] *Id.* at ¶ 6. Plaintiff, by contrast, accuses defendant Beecher of becoming hostile and of giving defendant Rosati the "signal" to begin the assault, and of encouraging defendant Rosati during the assault. Gillard Decl. (Dkt. No. 87) ¶ 4. Plaintiff claims that defendant Beecher stood by and did nothing as the purported assault occurred. *Id.* at ¶ ¶ 4, 10. In his declaration, defendant Beecher does not respond to this accusation.

> FN15. This appears to conflict with defendants' Local Rule 7.1(a) (3) Statement which states "Defendant Beecher escorted Plaintiff to the interview room." *See* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 82–1) ¶ 7.

**\*14** These conflicting accounts present an issue of fact as to whether defendant Beecher failed to intervene during the purported assault by defendant Rosati on September 17, 2007. As such, I recommend denying the portion of defendants' motion requesting dismissal of plaintiff's claims against defendant Beecher.

*2. Defendant Frazier*

Plaintiff accuses defendant Frazier of standing by on January 31, 2008 as he witnessed plaintiff being beaten by defendant Rosati, a lower ranked officer. Defendant Frazier states that he did not work at Great Meadow on that date. *See* Frazier Decl. (Dkt. No. 82–12) ¶ 4. As was stated earlier, these conflicting accounts present an issue of fact as to whether defendant Frazier was present at Great Meadow on January 31, 2008, and also whether he failed to intervene in the alleged assault. Accordingly, I recommend denial of defendant Frazier's motion for

summary judgment on the issue of his failure to intervene.
*G. Medical Indifference*

Plaintiff alleges that defendants Lapan, Hoy, Hendry, Besson, Nesmith, Verio, Labrum, Czerwinski, Silverberg, and Redmond were deliberately indifferent to his serious medical needs, in particular by denying his request for treatment of injuries sustained during the two alleged assaults. In their motion, defendants claim plaintiff has failed to establish both the existence of a serious medical need as well as a refusal by those defendants to provide the required treatment.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle,* 429 U.S. at 102, 104, 97 S.Ct. at 290–91. To satisfy their obligations under the Eighth Amendment, prison officials must ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. 832, 114 S.Ct. at 1976, 128 L.Ed.2d 811 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)) (internal quotations omitted).

Like plaintiff's excessive force claim, his claim of medical indifference must satisfy both objective and subjective requirements. *Wright,* 554 F.3d at 268; *Price v. Reilly,* 697 F.Supp.2d 344, 355–58 (E.D.N.Y.2010) (Bianco, J.). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions of 'wantonness.' " *Blyden,* 186 F.3d at 262. Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279–81 (2d Cir.2006).

*1. Objective Requirement*

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

**\*15** Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care ...", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin,* 467 F.2d at 279. A second prong of the objective test addresses whether the inadequacy of the medical treatment was sufficiently serious. *Id.* at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment ... [the focus of] the inquiry is on the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith,* 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over a sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment,' but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186 n. 10 (quoting *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136–37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "reasonable doctor or patient would find important and worthy of comment or treatment", a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain.' " *Chance,* 143

F.3d at 702 (internal quotations and citation omitted).

The record before the court reflects that plaintiff received at least some modicum of medical treatment following both the September 17, 2007 incident and the alleged assault on January 31, 2008. On September 20, 2007, plaintiff was examined at the Great Meadow infirmary by defendant Hoy, a corrections sergeant, and defendant Labrum, a nurse. Hoy Decl. (Dkt. No. 82–11) ¶ 5; Labrum Decl. (Dkt. No. 88) ¶ 4; Medical Records p. 8. Neither of those examining personnel observed any visible bruising during that examine. Hoy Decl. (Dkt. No. 82–11) ¶ 6; Labrum Decl. (Dkt. No. 88) ¶ 5. Plaintiff complained during that examination of back pain and a strained neck. Medical Records p. 8. On September 25, 2007, plaintiff was provided medication and a back brace for pain. Hoy Decl. (Dkt. No. 82–11) ¶ 7; Labrum Decl. (Dkt. No. 88) ¶ 6; *see also* Silverberg Decl. (Dkt. No. 82–8) ¶¶ 8–10. Standing alone, these allegations fail to establish the existence of a serious medical need of constitutional proportions. The record now before the court lacks evidence of extreme pain or severe degeneration; instead, the record discloses only injuries of a transitory nature which are insufficient to establish the existence of a serious medical need passing constitutional muster. *See Johnson v. Brown,* No. 9:09–cv–0002 (GTS/DEP), 2010 U.S. Dist. LEXIS 142207, 2010 WL 6243352, at \*14–15 (N.D.N.Y. Sept. 3, 2010) (Peebles, M.J.) (finding that a "busted lip, dime-sized bruise, and general complaints of pain" were not a serious medical condition), *report and recommendation adopted,* 2011 WL 1097864 (Mar. 22, 2011) (Suddaby, J.); *see also Ford v. Phillips,* No. 05 Civ. 6646(NRB), 2007 U.S. Dist. LEXIS 25226, 2007 WL 946703, at \*12 (S.D.N.Y. Mar.27, 2007) (concluding that minor bruising, slight bleeding, and abrasions are not injuries that may produce death, degeneration or extreme pain and that no reasonable juror could find otherwise).

**\*16** In addition to these allegations of a modest nature, plaintiff contends that he complained to defendant Lapan of vomiting blood following the January 31, 2008 incident, but that Lapan nonetheless denied his request for medical assistance. Gillard Decl. (Dkt. No. 87) ¶ 8; *see also* Am. Compl. (Dkt. No. 33) ¶ 90 ("Lapan ... refused to get the Plaintiff emergency medical attention as the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

Plaintiff was throwing up blood as well as face bruised" [*sic* ].). To be sure, vomiting blood can be an indication of a serious medical need. *See Hale v. Rao,* No. 9:08–cv–612, 2009 WL 3698420, at *5 (N.D.N.Y. Nov.3, 2009) (Hurd, J.) (citing *Morgan v. Maass,* No. 94–35834, 1995 U.S.App. LEXIS 38206, 1995 WL 759203, at *2 (9th Cir. Dec.26, 1995)). Because the summary judgment standard requires the court to resolve all ambiguities and draw all reasonable inferences against the moving party, I therefore find that there are factual issues concerning whether plaintiff's claims satisfy the objective prong of the deliberate indifference standard.

2. *Subjective Element*

The second, subjective requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin,* 467 F.3d at 280 (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *see also Leach v. Dufrain,* 103 F.3d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40, 114 S.Ct. at 1979–80).

Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition, on the other hand, does not implicate the Eighth Amendment and is not properly the subject of a section 1983 action. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Thus, for example, a physician who "delay [s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate

indifference. *Harrison,* 219 F.3d at 139. If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct is actionable as deliberate indifference. *Harrison,* 219 F.3d at 138; *Kearsey v. Williams,* No. 99 Civ 8646, 2005 U.S. Dist. LEXIS 19017, 2005 WL 2125874, at *5 (S.D.N.Y. Sep.1, 2005) (Batts, J.).

**\*17** While plaintiff's deliberate indifference claims potentially meet the objective prong, they fail to satisfy the subjective element of the controlling test. The record before the court reflects that plaintiff received considerable attention from medical personnel at Great Meadow for injuries allegedly suffered during the course of the September 17, 2007 attack. On September 21, 2007, plaintiff received a lumbar corset for his back pain. Silverberg Decl. (Dkt. No. 82–8) ¶ 9; Medical Records pp. 7–9. Four days later, on September 25, 2007, defendant Silverberg prescribed a back brace and pain medication. Silverberg Decl. (Dkt. No. 82–8) ¶ 10; Medical Records p. 7. On October 5, 2007, plaintiff presented requesting x-rays and a brace for back pain. Medical Records p. 5. Plaintiff advised during the course of that appointment that he had just been seen by a doctor and underwent MRI testing, and that he had just begun taking medication for his pain. Medical Records p. 4. Plaintiff was instructed to take the medication as ordered and allow it an opportunity to relieve the pain. *See id.*

On December 18, 2007, approximately two months later, Dr. Silverberg prescribed an ankle brace and lumbar corset for the plaintiff. Silverberg Decl. (Dkt. No. 82–8) ¶ 14; Medical Records pp. 25–26. Dr. Silverberg also recommended that plaintiff be referred to an orthopedic surgeon for evaluation of his ankle, although that recommendation was rejected in favor of attempting physical therapy first before being referred to an outside specialist. [FN16] Medical Records p. 11.

FN16. Significantly, plaintiff's medical records reveal that he failed to appear for scheduled physical therapy appointments for six consecutive weeks between November 7, 2007 and December 12, 2007. Medical Records pp. 13–18. This refusal of recommended treatment

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

further serves to negate plaintiff's allegations of deliberate indifference. *See Gillard v. Rovelli, No. 9:09–cv–0830 (NAM/GHL), 2010 U.S. Dist. LEXIS 124737, 2010 WL 4905240, at \*10 (N.D.N.Y. Sept. 29, 2010)* (Lowe, Mag. J.) (citing *Rivera v. Goord, 253 F.Supp.2d 735, 756 (S.D.N.Y.2003)*).

In sum, plaintiff received significant medical treatment following the September 17, 2007 incident. Based upon the record before the court, no reasonable factfinder could conclude that any of the individual defendants were subjectively indifferent to plaintiff's serious medical needs stemming from that event.

The record also reveals that plaintiff received substantial medical treatment following the January 31, 2008 incident. Although plaintiff complained to defendant Lapan that he was vomiting blood, plaintiff received medical attention one day later on February 1, 2008 from Physician's Assistant Fisher Nesmith, who treated him on that occasion for possible minor contusion under the right eye. Nesmith Decl. (Dkt. No. ¶ 82–10) ¶¶ 4–5; Medical Records p. 7. X-rays taken on that day were negative. Silverberg Decl. (Dkt. No. 82–8) ¶ 19; Medical Records p. 22–23.

A review of the record shows that between September 20, 2007 and February 15, 2008, plaintiff was seen by medical staff on at least thirteen different occasions. *See* Medical Records pp. 4–9, 27. Throughout that period, plaintiff received pain medication, x-rays, corsets, and braces. *See generally id.* Further, plaintiff was prescribed physical therapy, which he refused to attend. *Id.* at pp. 14–20. Succinctly stated, the record is devoid of any evidence upon which a reasonable factfinder could conclude that defendants acted with deliberate indifference to plaintiff's serious medical needs. Accordingly, I recommend that the portion of defendants' summary judgment motion seeking dismissal of plaintiff's medical indifference claims be granted.

H. *Verbal Harassment*

**\*18** In their motion, defendants also contend that plaintiff's claims against defendant Beecher stemming

from his alleged use of offensive language toward Gillard does not state a constitutional claim.

As a general matter, verbal harassment, including profanity, without any associated physical injury, does not give rise to a claim cognizable under section 1983. *See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986); Gill v. Hoadley, 261 F.Supp.2d 113, 129 (N.D.N.Y.2003)* (Peebles, M. J.); *Shabazz v. Pico, 994 F.Supp. 460, 474 (S.D.N.Y.1998)*. Nor do threats amount to a constitutional violation. *Malsh v. Austin, 901 F.Supp. 757, 763 (S.D.N.Y.1995)* (Koeltl, J.). Accordingly, plaintiff's claims of verbal abuse, alleging conduct which, if true, is both unprofessional and reprehensible, do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck,* No. 97–CV–253, 2000 U.S. Dist. LEXIS 9425, 2000 WL 949457, at \*3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio v. Walker,* No. Civ.A.95CV1502, 1997 U.S. Dist. LEXIS 1617, 1997 WL 642543, at \*6 (N.D.N.Y. Oct.15, 1997) (Pooler, J. & DiBianco, M.J.) ("verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation"). I therefore recommend granting summary judgment and dismissal of plaintiff's claims against defendant Beecher to the extent that they are predicated upon alleged verbal harassment.

I. *Qualified Immunity*

In addition to challenging the merits of plaintiff's claims, defendants assert that they are entitled to qualified immunity from suit based upon plaintiff's allegations.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)* (citations omitted). "In assessing an officer's eligibility for the shield, "the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1962, 143 L.Ed.2d 818, —— (1999). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2000).

**\*19** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at 232, 129 S.Ct. at 816. The first step requires the court to consider whether taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[FN17] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Cornwall–On–Hudson Police Dep't.,* 577 F.3d 415, 430 n. 9 (citing *Saucer* ).[FN18] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." [FN19] 555 U.S. at 236, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of the constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

> FN17. In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning

qualified immunity." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

> FN18. In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was unlawful." *Okin,* 577 F.3d at 433 n .11 (citation omitted).

> FN19. Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* 55 U.S. at 231, 129 S.Ct. 815.

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .*" Kelsey,* 567 F.3d at 61 (quoting *Pearson* ).

With regard to the excessive force and failure to intervene claims, the constitutional rights implicated were clearly established at the relevant times. As discussed above, I have concluded a reasonable jury could find that defendants violated plaintiff's constitutional rights to be free from cruel and unusual punishment. Accordingly, I recommend that defendants' motion for summary judgment on qualified immunity grounds be denied as to the excessive force claims and failure to intervene.[FN20]

> FN20. In view of my recommendation on the

Slip Copy, 2011 WL 4402131 (N.D.N.Y.)

(Cite as: 2011 WL 4402131 (N.D.N.Y.))

merits as to plaintiff's medical indifference and verbal harassment causes of action claims, I do not find it necessary to address defendants' claim that, in the alternative, they are entitled to qualified immunity with regard to those claims.

IV. *SUMMARY AND RECOMMENDATION*

At the heart of plaintiff's claims in this action are allegations that he was assaulted by corrections officials on two separate occasions and that others stood by and failed to intervene. In view of the conflicting accounts given by the parties regarding those claims, the grant of summary judgment at this juncture would be inappropriate, although certain of the defendants are entitled to dismissal based upon the lack of any showing of their personal involvement in the offending conduct. Plaintiff's additional claim that defendants were deliberately indifferent to his medical needs by failing to treat his resulting injuries lacks support in the record, and his claim based on verbal harassment fails as a matter of law; summary judgment should therefore be granted to defendants on those claims.

**\*20** Accordingly, it is therefore hereby respectfully,

RECOMMENDED, that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 82) be

1. GRANTED to the extent that damages are sought against the defendants in their official capacities;

2. GRANTED as to defendants Harris, Paige, Czerwinski and Besson based upon their lack of personal involvement in the deprivations alleged;

3. GRANTED as to plaintiff's claims of

a) Verbal harassment against defendant Beecher; and

b) Medical indifference as to all defendants; and

4. DENIED in all other respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roland v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2011.

Gillard v. Rosati
Slip Copy, 2011 WL 4402131 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 5147258 (N.D.N.Y.)

(Cite as: 2010 WL 5147258 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Gary GILLARD, Plaintiff,
v.
Michael ROVELLI, et al., Defendants.
No. 9:09-CV-0431 (TJM/DEP).

Dec. 13, 2010.
Gary Gillard, Attica, NY, pro se.

Michael G. McCartin, Office of Attorney General, The Capitol Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.
   **\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to the Report-Recommendation and Order dated August 30, 2010 have been filed, and the time to do so has expired. Furthermore, after examining the record, this Court has determined that the Report-Recommendation and Order is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report-Recommendation and Order for the reasons stated therein.
   It is therefore,

   **ORDERED** that Defendants' motion to dismiss (Dkt.# 27) is **GRANTED,** and all claims in this action with the exception of those against Hamel and McNally are **DISMISSED** with leave to replead consistent with Magistrate Judge Peebles' Report and Recommendation.

*See* Rep. Rec., p. 23, n. 7.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Gillard v. Rovelli
Slip Copy, 2010 WL 5147258 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Marc LEWIS, Plaintiff,
v.
J. JOHNSON, et al., Defendants.
No. 9:08-CV-482 (TJM/ATB).

Aug. 5, 2010.

Marc Lewis, pro se.

Christina L. Roberts-Ryba, Asst. Attorney General, for
Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.
   **\*1** This matter was referred by Senior U.S. District
Judge Thomas J. McAvoy, for Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rules N.D.N.Y. 72.3(c). The case was transferred
to me on January 4, 2010, following the retirement of U.S.
Magistrate Judge Gustave J. Di Bianco. (Dkt. No. 125).

   While an inmate in the custody of the Department of
Correctional Services ("DOCS"), plaintiff filed his
complaint, pursuant to 42 U.S.C. § 1983, regarding
incidents that occurred during his incarceration at Franklin
Correctional Facility ("Franklin") and Upstate
Correctional Facility ("Upstate"). Liberally construed,
plaintiff's amended complaint FN1 (Dkt. No. 40) makes
several claims against 14 defendants FN2 relating to events
in 2006 and 2007. He alleges that, in retaliation for his
filing of a letter complaining of an assault of another
inmate by correction officers at Franklin on or about June
15, 2006, defendant Johnson filed a false misbehavior
report against plaintiff, and defendant Gardner made
inflammatory statements regarding plaintiff to other staff,
prompting further acts of retaliation. FN3 Plaintiff claims
that defendants Secore and Favro violated his Eighth
Amendment rights by assaulting him on June 19, 2006,

and that defendant Norcross failed to intervene. He also
alleges that he was a victim of another unconstitutional
assault on June 24, 2006, by defendant Reardon and other
unnamed officers. Plaintiff claims that, over the following
days and weeks, nurses Davenport, Volpe, Walsh, and
Chesbrough, and physician assistant ("PA") Tichenor all
denied him constitutionally-adequate medical care, by
failing to properly treat him for the various injuries he
suffered as a result of the two "assaults." He states that
defendant Demars violated his due process rights, while
presiding at the disciplinary hearing on the charges
brought by defendant Johnson, which resulted in plaintiff's
confinement in a Special Housing Unit ("SHU") until the
charges were reversed by DOCS in June 2007. Finally,
plaintiff suggests that defendants McCasland and
Hoffnagle violated plaintiff's First Amendment rights by
improperly handling his legal mail in January 2007.
Plaintiff seeks substantial monetary damages from the
defendants.

   FN1. Plaintiff was granted leave to file an
   amended complaint on January 26, 2009. (Dkt.
   No. 39).

   FN2. It is well-settled that the state itself cannot
   be sued under section 1983. *Komlosi v. New
   York State OMRDD,* 64 F.3d 810, 815 (2d
   Cir.1995) (citing *Will v. Michigan Department of
   Police,* 491 U.S. 58, 71 (1989)). An action
   against state officers in their official capacities is
   tantamount to an action against the state.
   *Yorktown Medical Laboratory, Inc. v. Perales,*
   948 F.2d 84, 87 & n. 1 (2d Cir.1991). To the
   extent that the defendants are being sued in their
   official capacity for money damages, that cause
   of action should be dismissed under the Eleventh
   Amendment. *Huang v. Johnson,* 251 F.3d 65,
   69-70 (2d Cir.2001); *Posr v. Court Officer
   Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999).

   FN3. Plaintiff characterizes the subsequent
   actions of defendants Secore, Favro, Norcross,
   Reardon, Demars, McCasland, and Hoffnagle as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

retaliation, although he states or implies that their actions constituted separate constitutional violations, as well.

Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 110). Plaintiff has responded in opposition to the motion. (Dkt.Nos.123, 124). Defendants filed a reply (Dkt. No. 128), and plaintiff submitted a sur-reply (Dkt.Nos.129, 130). For the following reasons, this court recommends that defendants' motion be granted in part and denied in part. I particular, this court recommends that summary judgment be denied with respect to the Eighth Amendment excessive force or failure-to-intervene claims against defendants Secore, Favro, Norcross, and Reardon. Dismissal is recommended with respect to the plaintiff's other causes of action.

## DISCUSSION

### I. *Facts*

**\*2** Plaintiff authored and signed a letter dated June 15, 2006, complaining to the Superintendent of Franklin and other DOCS officials about the alleged assault of another inmate by at least four correction officers that evening. (Pl.'s Decl., Ex. A, Dkt. No. 124-3). Plaintiff spoke to the Superintendent in the mess hall about the letter on Saturday, June 17th, and the Superintendent said he would look for the letter and get back to the plaintiff. (Pl.'s Deposition ("Dep.") at 18-19, Dkt. No. 110-3). The letter was stamped as received in the administrative office at Franklin, on June 20, 2006 at 12:42 p.m. (Pl.'s Decl., Ex. A).

### A. The Misbehavior Report Filed by Defendant Johnson

On June 19, 2006, the administration at Franklin received a number of anonymous notes from inmates indicating that violence toward the facility staff was imminent because of prior staff actions involving inmates. Defendant Johnson, who was assigned to investigate these letters, was advised that the plaintiff had approached the Superintendent with "similar concerns" on June 17th. Lt. Johnson obtained samples of plaintiff's handwriting from his guidance folder and compared them to the anonymous, threatening notes. (Johnson Decl. ¶ 5, Dkt. No. 110-8).[FN4] He concluded that plaintiff's known handwriting was

similar to the writing on four of the anonymous letters, including one of the most threatening ones. (*Id.* ¶¶ 5, 6). Based on that and other investigation conducted by several officers, Lt. Johnson filed a misbehavior report on June 19th, accusing plaintiff of authoring some of the threatening letters. (*Id.* ¶ 6 & Ex. A, Dkt. No. 110-8 at 6). He directed that plaintiff be confined in the SHU pending the disciplinary hearing (*Id.,* Ex. A), which is permitted by DOCS directives governing inmate discipline (DOCS Directive 4932, Parts 251-1.6 & 251-1.7, *Id.,* Ex. C, Dkt. No. 110-8 at 21-22).

> FN4. Lt. Johnson had prior, on-the-job experience comparing handwriting, but no formal forensic training. (*Id.* ¶ 9; Disc. Hearing Transcript at 21, 23, Dkt. No. 110-8). Citations to the disciplinary hearing transcript will reference the consecutive page numbers on the bottom righthand corner of the pages, not the page numbers in the CM-ECF header.

A disciplinary hearing regarding these charges, for which defendant Demars served as the hearing officer, was conducted over several days. Plaintiff and several other witnesses, including Lt. Johnson and the Franklin Superintendent testified. (Disc. Hearing Transcript at 1-67). Plaintiff was found guilty of the charges and was sentenced, on July 5, 2006, to serve nine months in SHU with corresponding loss of privileges. (Disc. Hearing Transcript at 66; Pl.'s Decl., Ex. B, Dkt. No. 124-4 at 4). After various levels of appeal and review, the guilty disposition was administratively reversed by DOCS on June 19, 2007 because the hearing officer (defendant Demars) did not conduct an independent review of the handwriting comparisons about which Lt. Johnson testified. (Pl.'s Decl., Ex. B, Dkt. No. 124-4 at 6, 13).[FN5] On or about July 2, 2007, plaintiff was ordered released from the SHU at Upstate. (*Id.,* Dkt. No. 124-4 at 14).

> FN5. During June 2006, plaintiff received several other misbehavior reports for which he was found guilty and sentenced to additional time in the SHU. Although plaintiff seems to contend that one of these other hearings was reversed, the documentation submitted seems to indicate that only the disciplinary conviction of July 5, 2005 was reversed. (*Id.,* Dkt. No. 124-4

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

at 4-6, 11-14).

**B. The First "Assault" on June 19, 2005**

Plaintiff alleges that defendant Gardner, then a sergeant at Franklin, was involved in plaintiff's transfer to the SHU on June 19, 2005, following the filing of the disciplinary charges relating to the threat letters. (Amended Complaint ("AC"), Statement of Facts, ¶¶ 3-4, Dkt. No. 40 at 9-10; FN6 Gardner Decl. ¶¶ 2-7, Dkt. No. 110-10). Plaintiff alleges that, during the transfer, Sgt. Gardner told defendants Secore and Favro that the plaintiff "needed to be taught the policies and procedures of the Franklin Correctional Facility because the plaintiff liked to make threats at correctional staff and write them up." FN7 (AC ¶ 4).

> FN6. Subsequent references to the Amended Complaint will refer only to the paragraph number in the "Statement of Facts," unless the reference is to another section of the pleading.

> FN7. Defendant Gardner did not recall the plaintiff, but states that he would not have made such a statement to an inmate. (Gardner Decl. ¶¶ 5-6).

**\*3** Plaintiff claims that defendants Secore and Favro then escorted him into the main foyer of the SHU where they struck him on the back of the head and on the jaw. (AC ¶¶ 6-8). Plaintiff alleges these two plaintiffs then dragged him into the "strip frisk room" where these two correction officers tripped plaintiff and then repeatedly punched and kicked him while he was handcuffed on the floor. (AC ¶¶ 9-10). Plaintiff claims further that defendant Norcross was in the strip frisk room while this assault was going on, and failed to intervene. (AC ¶ 11). While there are some minor discrepancies in their accounts, defendants Secore, Favro, and Norcross all state that, during the strip frisk procedure at the SHU, plaintiff raised a fist and then struggled when the officers moved to restrain him. The officers assert that they used the minimum force necessary to bring plaintiff under control, and that he was not "assaulted." (Secore Decl., Dkt. No. 110-11; Favro Decl., Dkt. No. 110-12; Norcross Decl., Dkt. No. 110-18). FN8

> FN8. The correction officer's account of the

incident was documented in a use-of-force report and a subsequent disciplinary hearing, which resulted in a finding that the officers used reasonable and necessary force, and that the plaintiff engaged in violent conduct and other infractions. (Id.).

Plaintiff claims that, as a result of the assault, he suffered injuries to his rib cage and a dislocated jaw. He alleges that, in the hours and days following the incident, Nurse Davenport and Nurse Volpe refused to examine him and treat his injuries. (AC ¶¶ 13-17). Both nurses state that they spoke with and examined plaintiff between June 19 and 22, and found no evidence that he was injured. (Davenport Decl., Dkt. No. 110-19; Volpe Decl., Dkt. No. 110-14). The nurses completed an Inmate Injury Report and/or medical records, which documented their examinations of plaintiff. (Id.; Secore Decl., Ex. B, Dkt. No. 110-11 at 8, 15, 18-19, 22-25; Medical Records FN9 at 34-36). Plaintiff claims that these records were fabricated and false. (AC ¶ 15; Pl.'s Decl., Dkt. No. 124-2 at 4-6).

> FN9. The defendants submitted the plaintiff's medical records *in camera* and they are stamped with sequential page numbers.

**C. The Second "Assault" on June 24, 2005**

Plaintiff alleges that, on June 24, 2005, defendant Reardon assaulted him in his cell in the presence of other unnamed correction officers. Plaintiff alleges that defendant Reardon "took the plaintiffs [sic] left arm and pulled all the way back into a 90 ° degree angle while having him in a body lock ..." (AC ¶ 20). Plaintiff claims that, as a result of this assault, he suffered a torn tendon to his left armpit. (AC ¶ 23).

Officer Reardon acknowledged having contact with plaintiff in the Franklin SHU on June 20 and 24, 2006; he issued inmate misbehavior reports against the plaintiff on both dates. (Reardon Decl. ¶¶ 3-4, 10-12, Dkt. No. 110-13). Defendant Reardon denies assaulting plaintiff and notes that, on June 29th, at the disciplinary hearing regarding the June 20th misbehavior report, plaintiff said nothing about the alleged assault five days earlier. (Id. ¶¶ 5-8, 14). Plaintiff did, however, complain of the alleged assault in a grievance dated June 25th. (Pl.'s Decl., Ex. C, Dkt. No. 124-5 at 39-41). As a result of the grievance,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

plaintiff was eventually transferred to the SHU at Upstate. (*Id.*).

**D. Further Issues Regarding Medical Treatment**

**\*4** Plaintiff claims that, upon his admission to Upstate on July 12, 2006, Nurse Walsh refused to examine plaintiff for injuries relating to the two prior assaults, advising him to request sick call. He alleges further that Nurse Chesbrough refused to provide him with treatment the next day because this defendant thought the plaintiff was lying about not being treated earlier at Franklin. (AC ¶¶ 23-24). After reviewing the relevant medical records, defendants Walsh and Chesbrough both concluded that Nurse Chesbrough examined plaintiff both on July 12th and 13th, and concluded that he had no apparent medical problems. (Walsh Decl. ¶¶ 6-7, Dkt. No. 110-15; Chesbrough Decl. ¶¶ 6-9, Dkt. No. 110-16).

Plaintiff also complains that PA Tichenor examined him several months after the alleged assaults, mis-diagnosed his left arm injury, and refused to examine his rib cage and jaw despite claims of continuing pain in those areas. (AC ¶ 25). Based on her review of plaintiff's medical records, defendant Tichenor stated that she examined and treated plaintiff conservatively for various medical conditions, including back and shoulder pain, on September 6, 2006 and several times thereafter. (Tichenor Decl., ¶¶ 6-11, Dkt. No. 110-17).

**E. Issues Regarding Legal Mail**

Plaintiff alleges that, on January 22 and 23, 2007, defendants McCasland and Hoffnagle attempted to deliver two pieces of legal mail that had been opened outside of plaintiff's presence, contrary to DOCS procedures. Plaintiff refused to accept the opened mail on two occasions, and claims that defendant Hoffnagle then lost or destroyed the two parcels, which should have been returned to the sender. (Dep. 66-71, AC ¶¶ 31-33). Plaintiff does not document that he was prejudiced in any particular legal proceedings as a result of the alleged mishandling of his mail.

Defendant McCasland stated that he opened the two parcels of legal mail in plaintiff's presence on January 22nd, but that plaintiff refused the mail because he was upset that another parcel was returned to plaintiff for insufficient postage. (McCasland Decl. ¶¶ 6-9, Dkt. No.

110-20). Defendant Hoffnagle states that, when plaintiff refused the two open parcels the next day, he returned them to the mail room. (Hoffnagle Decl., ¶¶ 4-10, Dkt. No. 110-21). Based on a grievance filed by plaintiff, DOCS found no evidence that the defendants mishandled plaintiff's legal mail, although one report found that the mail officers did not properly document their handling of the parcels. (McCasland Decl., Ex. B, Dkt. No. 110-20 at 44).

**II.** *Summary Judgment-Legal Standards*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

**\*5** The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers ." *Govan v. Campbell,* 289 F.Supp.2d 289, 295

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

(N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir .1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). While a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

**III. *Excessive Force/Failure to Intervene***

**A. Legal Standards**

**1. Eighth Amendment-Excessive Force**

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9-10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided

that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

***6** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

**2. Failure to Intervene**

A correction officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Cicio v. Graham,* No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. March 15, 2010); *Tafari v. McCarthy,* No. 9:07-CV654 (DNH/GHL), 2010 WL 2044705, at*8 (N.D.N.Y. May 24, 2010) .[FN10] A law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Id.*[FN11] In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Id.; Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

FN10. *See also* *Fischl v. Armitage,* 128 F.3d 50, 57 (2d Cir.1997) (reversing grant of summary judgment for defendant based on evidence that defendant was in the vicinity of an assault on plaintiff and failed to intervene); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

FN11. *See also* *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

**B. Application**

Plaintiff has adequately alleged that the named correction officers either participated in, or were present for and failed to intervene in, the application of excessive force. While plaintiff's excessive force claims have weak evidentiary support, he has established that there are genuine issues of material fact that should be resolved by a jury.

**1. The "Assault" on June 19, 2010**

Defendants Secore and Favro admittedly used force to subdue plaintiff on June 19, 2010. In his amended complaint (Dkt. No. 40), deposition (Dep. at 31-38, and pleadings in opposition to the summary judgment motion, plaintiff consistently alleged details of an assault which, if believed, would amount to a "malicious use of force to cause harm" that constitutes a *per se* Eighth Amendment violation regardless of the seriousness of his injuries. *Blyden,* 186 F.3d at 263. Plaintiff claims he was struck in the head or face by each defendant, dragged to another room, tripped, and repeatedly punched and kicked while he was lying handcuffed on the floor. Although plaintiff admits that he kicked at the correction officers to try to defend himself from their blows once he was on the floor (Dep. at 33-34), this did not justify the alleged prior application of excessive force. As described by plaintiff, the incident involved more than an *de minimis* use of force and a malicious and wanton attempt to cause harm. *Sims,* 230 F.3d at 22; *Hudson,* 503 U.S. at 7.

**\*7** The correction officers and Sgt. Norcross all vehemently deny that more than the minimum amount of force required to restrain the plaintiff was used, and the

medical evidence does not corroborate plaintiff's claims of significant injuries to his rib cage and jaw.FN12 However, given that issues of credibility should not be resolved on a summary judgment motion, this court cannot conclude that no rational juror could find that defendants Secore and Favro violated plaintiff's Eighth Amendment rights on June 19, 2006. *See, e.g., Griffin v. Crippen,* 193 F.3d 89, 90-92 (2d Cir.1999) (although plaintiff could offer only his own testimony and evidence of a bruised shin and a swollen left knee in support of his excessive force claim, dismissal was inappropriate because there were genuine issues of material fact concerning whether correction officers, whom plaintiff admittedly assaulted, maliciously used force against him after he was subdued and handcuffed); *Sims v. Artuz,* 103 Fed. Appx. 434, 437 (2d Cir.2004) (plaintiff's allegations that he was kicked and punched while being removed from his cell after causing a disruption, corroborated in part by documented minor injuries,FN13 were sufficient to withstand a summary judgement motion); *Dallio v. Sanatamore,* 9:06-CV-1154 (GTS/DRH), 2010 WL 125774, at \*9 (N.D.N.Y. Jan. 7, 2010) (because the court should not weigh the evidence or make credibility determinations, summary judgment would be denied where plaintiff alleged that he was repeatedly kicked and punched after he was subdued and restrained by correction officers, notwithstanding the relatively minor injuries the plaintiff suffered and the substantial contrary evidence proffered by the defendants); *Cicio v. Lamora,* 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at \*7-8 (N.D.N.Y. Feb. 24, 2010) (denying summary judgment on plaintiff's claim that defendant correction officer hit inmate several times after he was subdued and helpless, despite "seemingly overwhelming" contradictory evidence, including the fact that plaintiff suffered only a minor bruise).

FN12. As discussed below, medical records indicate that plaintiff complained of, and in some cases received treatment for, pain in his back and shoulder in the months following June 2006. Plaintiff may have difficulty establishing that his subsequent medical problems were caused by the alleged incident of excessive force. While that may well be the case, and plaintiff may have few, if any compensable injuries, that does not support dismissal on summary judgment. *See,*

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

*e.g., Reyes v. McGinnis,* 00-CV-6352, 2003 WL 23101781, at *6 (W.D.N.Y. Apr. 10, 2003) (whether an injury to inmates wrist was caused by trauma resulting from defendant's use of handcuffs was a factual issue for the jury); *Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994) (while plaintiff may not have proved compensable injuries caused by the use of excessive force, he still could be entitled to a judgment under Section 1983 and an award of nominal damages at trial).

FN13. The Second Circuit reversed the grant of summary judgment, which was based, in part, on the district judge's conclusion that the plaintiff "would have suffered 'far greater injury than actually occurred' if his account [of the incident] were accurate." *Id.*

Plaintiff alleges that he saw that Sgt. Norcross was present while he was being kicked and punched on the floor of the strip frisk room and told plaintiff to "calm down." (Dep. at 36-38). Defendant Norcross admits he was in the room with plaintiff and defendants Secore and Favro, although he denies that any excessive force was applied. (Norcross Decl. ¶¶ 4-9, Dkt. No. 110-18). Given plaintiff's allegations about the nature and duration of the beating he received while in Sgt. Norcross's presence, it would have been clear to this defendant that excessive force was being applied, and he would have had an opportunity to intervene to stop the assault by his subordinates. While there are obviously issues of credibility that may ultimately be resolved against the plaintiff, he has established that there are issues of fact regarding defendant Norcross's culpability that should be addressed at trial.

**\*8** To the extent that plaintiff is alleging that defendants Gardner and Davenport were personally involved in the application of excessive force by defendants Secore and Favro, this court recommends dismissal of those claims. [FN14] Neither defendant was present during the alleged assault and thus did not have a realistic opportunity to intervene. There is no allegation that Nurse Davenport had any reason to anticipate the alleged assault, or any knowledge of the incident until it

was over. In any event, she lacked the authority to intervene while correction officers were using force on an inmate, even if she were present. [FN15]

FN14. *See, e.g., Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (personal involvement is a prerequisite to the assessment of damages in a section 1983 case); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

FN15. *See e.g., Rendely v. Town of Huntington,* No. 2:03-CV-3805, 2006 WL 5217083, at *6 (E.D.N.Y. Aug. 30, 2006) (because defendants were civilian government employees, and thus not law enforcement officials, they had no authority or duty to prevent the police officers from taking plaintiff into custody); *Phoenix v. Reddish,* 175 F.Supp.2d 215, 220 (D.Conn.2001) (there is no Supreme Court or Second Circuit authority that imposes an affirmative duty on a non-police state actor to intervene to prevent a police officer from conducting an unlawful search and seizure).

Even if then Sgt. Gardner made the comment to defendants Secore and Favro that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," that alone would not suggest the state of mind required to establish his responsibility, under the Eighth Amendment, for a subsequent assault by the other correction officers. *Cf. Bouknight v. Shaw,* 08 Civ. 5187, 2009 WL 969932, at *5 (S.D.N.Y. Apr. 6, 2009) (to establish officer's liability, under Section 1983, for the assault of plaintiff by other inmates, plaintiff needed to allege more than the fact that the officer spread rumors that plaintiff was a "snitch" and a homosexual; plaintiff needed to allege facts establishing that the officer intended to incite an assault or knowingly disregarded that he had created an environment that generated a significant risk of harm).[FN16] A comment that plaintiff needed to be taught the rules of the prison, as he was being transported to the SHU because of a disciplinary charge, is subject to a completely benign interpretation. Plaintiff's bare allegation that defendant Gardner made that statement does not establish a viable cause of action that Gardner induced the other defendants

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

to commit assault.

> FN16. It should be noted that verbal abuse, whether threatening, vulgar, or racial in nature, does not, by itself, rise to the level of a constitutional violation. See, e.g., *Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986); Ramirez v. Holmes, 921 F.Supp. 204, 210 (S.D.N.Y.1996)*.

**2. The "Assault" on June 24, 2006**

Plaintiff alleges that, during a cell search on June 24, 2006, defendant Reardon pulled plaintiff's arm back at almost a 90 degree angle while holding him up against a wall. Plaintiff asserts that defendant Reardon was talking "tough stuff" during the incident and was either trying to break plaintiff's arm or cause him pain. (Dep. at 64). Plaintiff claims that he suffered a tear to the tendon under his left arm, which caused lasting limitations in function. (Pl.'s Memo. of Law at 24-25, Dkt. No. 124-1; Dep. at 80). Some months later, PA Tichenor diagnosed plaintiff with a left shoulder sprain and then tendinitis of the left pectoralis major tendon. (Tichenor Decl. ¶ 10; Medical Records at 27, 31). When plaintiff was examined by a prison doctor in April 2008, he detected a slight defect in plaintiff's "left bicep [?] tendon" that was, by that time, "functionally insignificant." (Medical Records at 11; Dep. at 80).

Officer Reardon admittedly interacted with plaintiff on June 24th, when he issued a misbehavior report to him, but denies that he applied any physical force. (Reardon Decl. ¶¶ 10-14). Defense counsel argues that plaintiff failed to mention the alleged assault on June 24th during a subsequent disciplinary hearing on a prior charge defendant Reardon filed on June 20th, indicating that the incident never happened. However, as noted, plaintiff filed a grievance on June 25th describing the assault. His allegations, although largely unsupported, are sufficient to create an issue of fact regarding what force, if any, defendant Reardon applied during the incident on June 24th.

**\*9** Defendants also argue that any use of force on plaintiff on June 24th was *de minimis* and not sufficient to support an Eighth Amendment claim. The alleged use of force described by plaintiff exceeded what was reasonable and necessary under the circumstances-a cell inspection with no suggestion that plaintiff physically resisted or posed any threat to the safety of the officers.[FN17] While the alleged use of force on plaintiff's left arm was brief, plaintiff has alleged that it was intense and caused a significant and lasting injury, for which he has provided some, albeit marginal, supporting medical documentation.[FN18]

> FN17. Defense counsel construes a comment during plaintiff's deposition as an admission that he "came off the wall" during the cell search. (Def. Memo. of Law at 19-20, Dkt. No. 110-6). This court interprets plaintiff's testimony (Dep. at 62-63) as speculation that multiple guards were present during the cell search in case he came off the wall or otherwise resisted. Defendant Reardon's declaration about his interaction with plaintiff on June 24th, and the misbehavior report issued against plaintiff, do not suggest that plaintiff did anything to necessitate the use of force. (Reardon Decl. ¶¶ 10-14 & Ex. D, Dkt. No. 110-13 at 32).

> FN18. Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm allegedly caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in his cell door. (Medical Records at 24). So the extent to which the left arm injuries detected by the doctor in 2008 were caused by the alleged assaults in June 2006 is unclear.

Plaintiff's allegations regarding defendant Reardon's state of mind are fairly conclusory; however, he does claim that the defendant was talking "tough" under circumstances which could provoke a malicious use of force.[FN19] While plaintiff's claim of excessive force against defendant Reardon is very thin, this court finds that there are genuine and material issues of fact that require credibility assessments, which should not be made in the context of a summary judgment motion. *See, e.g., Mitchell v. Keane, 974 F.Supp. 332, 340-41 (S.D.N.Y.1997)* (allegation that officers twisted baton in the chain of the

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

inmate's shackles, causing considerable pain, when inmate was not resisting and had been subdued, were sufficient to meet objective and subjective elements of Hudson test, so as to preclude dismissal); *Rivera v. Goord,* 119 F.Supp.2d 327, 342 (S.D.N.Y.2000) (finding plaintiff's allegations that defendants "pinned him against a wall, face-first, twisted his arms behind his back, and banged his face against the wall" sufficient to state a claim for excessive force); *Reyes v. McGinnis,* 00-CV-6352, 2003 WL 23101781, at *1, 6 (W.D.N .Y. Apr. 10, 2003) (denying summary judgment motion on excessive force claim against correction officer who, *inter alia,* allegedly applied handcuffs too tightly, and lifted plaintiff from the floor by his handcuffs, causing nerve damage in his wrists and a possible ganglion cyst). Cf. *Robison v. Via,* 821 F.2d 913, 924-25 (2d Cir.1987) (sustaining excessive force claim where the arresting officer twisted the plaintiff's arm, "yanked" her, and threw her up against a car, causing only bruising).

> FN19. During his deposition, plaintiff acknowledged that he was being uncooperative with the guards following his confinement in the SHU-*e.g.,* by refusing meals brought by the officers and acting like a "knucklehead." (Dep. at 63, 65).

**IV. *Due Process***

Plaintiff claims that defendant Demars violated his due process rights in presiding over the disciplinary hearing on the charges initiated by defendant Johnson. For the reasons set forth below, this court finds that the due process claim is not viable and that, in any event, defendant Demars would be protected by qualified immunity for his conduct as a hearing officer.

**A. Applicable Law**

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. See *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property

interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Defendants apparently concede that the disposition of the most serious disciplinary charge against plaintiff, which resulted in a sentence of nine months in the SHU, implicated a liberty interest, the deprivation of which required due process safeguards. [FN20]

> FN20. In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Second Circuit has explicitly avoided a bright line rule that a certain period of SHU confinement automatically give rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64-66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under Sandin." *Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement). Although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, SHU confinements of fewer than 101 days may constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions. *Palmer v. Richards,* 364 F.3d at 65. In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in SHU was short-e.g., 30 days-and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65-66 (collecting

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

cases).

**\*10** In *Wolff v. McDonnell,* 418 U.S. 539, 563-64 (1974), the Supreme Court held that due process requires advance notice of the charges against the inmate, and a written statement of reasons for the disposition. The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983) (fair and impartial hearing officer). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation).[FN21]

> FN21. "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky,* 01CIV.8235, 2002 WL 31040370, at \*13 n. 21 (S.D.N.Y. Sept. 12, 2002) (citing *Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

An inmate's right to assistance with his disciplinary hearing is limited. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

**B. Application**

In his amended complaint and Memorandum of Law, plaintiff sets forth several ways in which he alleges that defendant Demars, the hearing officer determining whether plaintiff wrote several anonymous threatening letters, denied him due process in conducting the hearing.[FN22] Plaintiff alleges first that there was no evidence to support the allegations on which defendant Demars found him guilty. (AC ¶ 19). Plaintiff argues further that the hearing officer failed to make an independent assessment of the handwriting comparison evidence, which was the basis on which his guilty disposition was eventually overturned by DOCS. (Pl.'s Memo. of Law at 32; Pl.'s Decl., Ex. B, Dkt. No. 124-4 at 13). Finally plaintiff claims that his right to assistance in handling his disciplinary hearing was violated in several ways, in part because the hearing officer, not another DOCS employee or inmate, provided the assistance. (Pl.'s Memo. of Law at 30).[FN23]

> FN22. Plaintiff claims that he was illegally confined in the SHU from June 19, 2006, when Lt. Johnson's disciplinary charge was filed, until the disciplinary hearing was completed on July 5th. (Pl.'s Memo. of Law at 31, 33). This period of administrative detention in the SHU does not trigger due process protection because it was of such a short duration. *See, e.g., Brown v. Secore,* 9:08-CV-085, 2010 WL 980233, at \*5 (N.D.N.Y. March 15, 2010) (The district courts in the Second Circuit, applying *Sandin,* have been consistent in holding that terms of SHU or 'keeplock' of approximately 30 days or less, and the related loss of privileges, do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.) (collecting cases).

> FN23. Plaintiff claims that defendant Demars violated New York state regulations when he started the hearing on the same day that plaintiff indicated that he wanted assistance in handling the proceeding, without giving plaintiff additional time to prepare. (Pl.'s Memo of Law at 32; DOCS Directive 4932, Part 254.6(a)(1), Dkt. No. 110-8 at 28). However, after defendant Demars ascertained what assistance plaintiff

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

needed on the first day of the hearing (June 22, 2006), he adjourned the hearing for several days (until June 30th) while he made arrangements to procure the documents and witnesses plaintiff requested. (Disc. Hearing Transcript at 6-9). Even if there was a technical violation of the DOCS directive, plaintiff waived any objection on June 22nd (*Id.* at 6-7), and clearly suffered no due process violation because he was given ample time to prepare for the continuation of the hearing.

**1. "Some" Evidence**

In finding plaintiff guilty of two charges relating to the anonymous, threatening letters, defendant Demars stated that he relied primarily upon the inmate misbehavior report and Lt. Johnson's testimony regarding the similarities that he observed in the handwriting of several of the threat letters and known samples of plaintiff's writing. (Disc. Hearing Transcript at 66).[FN24] The anonymous letters, which were exhibits at the hearing, threatened physical retaliation against the corrections staff if there was another beating of an inmate, following an alleged assault of an inmate by officers in G-dorm at Franklin. (Johnson Decl., Ex. B, Dkt. No. 110-8 at 8-14). Defendant Johnson's misbehavior report noted that plaintiff had expressed "similar concerns" to the Superintendent two days before the threat letters were received. (Johnson Decl., Ex. B, Dkt. No. 110-8 at 6). During his testimony at the disciplinary hearing, Lt. Johnson set forth his prior experience in handwriting comparison and explained, in some detail, the similarities he observed between the threat letters and the samples of plaintiff's writing from his guidance folder, which were also exhibits. (Disc. Hearing Transcript at 21-22).

> FN24. Lt. Johnson also noted that he considered the testimony of plaintiff and the other hearing witnesses in reaching his conclusions. (*Id.*) Capt. Phelix, when called and questioned by plaintiff, corroborated Lt. Johnson's opinion that there were numerous similarities between plaintiff's handwriting and the writing on some of the threat letters. (Disc. Hearing Transcript at 32-33).

**\*11** While meager, the proof relied upon by defendant

Demars constituted "some evidence" sufficient to satisfy the requirements of due process applicable to prison disciplinary hearings. *See, e .g., Monier v. Holt,* 4:CV-05-2062, 2005 WL 3531369, at *2 (M.D.Pa. Dec. 21, 2005), *aff'd,* 259 Fed. Appx. 518 (3d Cir.2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson,* 1:07CV114-03, 2007 WL 1033359, at *3 (W.D.N.C. Apr. 2, 2007), *aff'd,* 242 Fed. Appx. 19 (4th Cir.2007), *cert. denied,* --- U.S. ----, 128 S.Ct. 2960 (2008) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 341 n. 3 (W.D.N.Y.2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson,* 2:06CV019, 2006 WL 618124, at *2 (E.D.Ark. Mar. 9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards). While DOCS ultimately determined, as a matter of equity or state law, that the hearing examiner should have made an independent handwriting comparison, his apparent failure to do so did not violate the federal due process rights of the plaintiff. *See, e.g., Monier v. Holt,* 2005 WL 3531369, at *2 (hearing officer did not violate due process by accepting the officer's testimony regarding his handwriting comparison); *Bennett v. Jackson,* 2006 WL 618124, at *2 (hearing officer who accepted officer's testimony regarding handwriting comparison without requiring expert analysis satisfied due process standards); *Brown v. Dotson,* 2007 WL 1033359, at *3 (testimony regarding handwriting comparison by investigating officer was not corroborated because the inappropriate letter plaintiff was accused of writing, which was tainted with bodily fluids, was destroyed).[FN25]

> FN25. In limited circumstances, the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing. *See, e.g., Taylor v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

*Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (a finding based on information from a confidential informant will satisfy due process requirements only when there has been some examination of the factors relevant to the informant's credibility); *Luna v. Pico,* 356 F.3d 481, 489-90 (2d Cir.2004) (a bare accusation from a non-testifying victim is insufficient to support a disciplinary finding unless the examiner has engaged in some examination of the factors bearing on the victim's credibility). However, the Second Circuit cases have not engrafted, on the "some evidence" standard of *Superintendent v. Hill,* a general requirement that officers at prison disciplinary hearings independently assess the reliability of other sources of evidence. *See Luna v. Pico,* 356 F.3d at 491 (noting that the holding of *Taylor v. Rodriguez* regarding confidential informants provides some guidance, but is not controlling, with respect to other sources of evidence). This court concludes that *Taylor* and *Luna* do not impose a due process requirement that a hearing officer perform independent analysis of lay handwriting comparisons of a witness who testifies at a prison disciplinary hearing and is subject to crossexamination. If Second Circuit or Supreme Court authority is subsequently construed to require such independent analysis in the context of this case, defendant Demars would be entitled to qualified immunity because it would not have been clear to him, in 2006, that his conduct of the hearing violated plaintiff's due process rights.

**2. Adequacy of Assistance at the Hearing**

Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was clearly entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988). On the first day of the hearing, defendant Demars noted that plaintiff had not signed the form served on him with the formal charges by which he could request assistance in connection with the hearing. (Disc. Hearing Transcript at 1). [FN26] Dep. Sup. Demars offered assistance to plaintiff in securing

witnesses and documents for the hearing, and plaintiff accepted. Plaintiff explained what help he needed and, before the hearing was adjourned for several days, stated that he was satisfied with the assistance that the hearing officer provided. (Disc. Hearing Transcript at 1-7).

> [FN26.] Plaintiff completed the form requesting independent assistance in connection with another disciplinary hearing that was proceeding in June 2006, so he clearly was aware of his right to assistance and the related DOCS procedures. (Secore Decl., Ex. C, Dkt. No. 110-11 at 28). Plaintiff formally waived his right to any assistance in connection with another hearing that month. (Reardon Decl., Ex. B, Dkt. No. 110-13 at 10).

*12 Ultimately, defendant Demars arranged for the testimony of all of the witnesses that plaintiff deemed critical, including the Superintendent of Franklin, although Dep. Sup. Demars was dubious about why plaintiff needed the Superintendent. (Disc. Hearing Transcript at 10-19, 25-29, 39, 41-42, 44-45, 53, 61). The hearing officer procured copies of most of the documents that plaintiff requested, although the facility was unable to locate one "pass" which plaintiff requested. Defendant Demars turned down plaintiff's request for DNA testing of the anonymous, threatening letters that prompted the charges. (Disc. Hearing Transcript at 9-10, 29). While plaintiff raised numerous "objections" at the end of the hearing, he did not object to any deficiencies in the assistance he received from defendant Demars. (Disc. Hearing Transcript at 64-65) .[FN27]

> [FN27.] Plaintiff did object that defendant Demars was biased because he was a "Dep.," (presumably referring to his position as a Deputy Superintendent at Franklin); he stated, at the end of the hearing, that "Albany" (presumably DOCS headquarters) should have appointed a hearing officer. (Disc. Hearing Transcript at 65). *See Chavis v. Flagler,* 01-CV-0510, 2005 WL 563055, at *4 (W.D.N.Y. Mar. 8, 2005) (in due process analysis, prison disciplinary hearing officer are not held to the same standards regarding neutrality and conflicts of interests as judges or adjudicators in other contexts, although

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

they may not prejudge the evidence).

Plaintiff cites a 1995 opinion of then-District Judge Sotomayor for the proposition that a hearing examiner who purports to provide assistance to the charged inmate cannot be "impartial" and violates the due process rights of the accused *per se. Lee v. Coughlin, 902 F.Supp. 424, 433-34 (S.D.N.Y.1995).* However, the plaintiff in *Lee* specifically requested assistance from individuals other than the hearing officer. In this case, plaintiff waived any objection to having the hearing officer also provide him assistance in procuring documents and witnesses, by his failure to complete and submit the form requesting assistance from another source, and his statement expressing his satisfaction with the alternative arrangement offered by defendant Demars. *Jackson v. Johnson, 30 F.Supp.2d 613, 619 (S.D.N.Y.1998)* (the courts in this circuit have established that an inmate's silence can constitute waiver of his right to assistance at a disciplinary hearing) (citing, *inter alia, Murray v. Dixon, 107 F.3d 3 (table), 1997 WL 73152, at *2 (2d Cir.1997)* (affirming hearing officer's determination that inmate waived his right to assistance because the inmate "admits that he refused to sign the required request for employee assistance presented to him when he was served with the misbehavior report, and he does not allege that he requested assistance between his refusal and the hearing")).

Moreover, the *Lee* court found that the hearing officer, in fact, provided assistance that was deficient in several substantial respects. *Id.* In a 1998 decision, the Second Circuit held that, when an inmate agrees to accept assistance from a hearing officer who thereafter does nothing to assist, the inmate's due process rights are violated. *Ayers v. Ryan, 152 F.3d at 81.* While the Second Circuit characterized it as possibly "odd or irregular" for a hearing officer to offer to serve as an assistant and for the inmate to accept that offer, it did not characterize this arrangement as a *per se* due process violation. *Id.* At least one subsequent district court in this circuit has held that, where the hearing officer actually provided adequate assistance to an inmate, the fact that the hearing officer also served as the assistant does not violate due process. *Clyde v. Bellnier, 9:08-CV-909, 2010 WL 1489897, at *6 (N.D.N.Y. April 13, 2010)* (Singleton, J.).

**\*13** As discussed above, defendant Demars actually provided reasonable and adequate assistance to plaintiff in connection with his disciplinary hearing. *See, e.g., Jackson v. Johnson, 30 F.Supp.2d at 619* (a hearing assistant's role is not to act as legal advisor or advocate, but to serve as a surrogate, performing functions, such as contacting witnesses, which the charged inmate could not do because he is not among the general population) (collecting cases); *Clyde v. Bellnier, 2010 WL 1489897, at *6* (no due process arose when the hearing officer/assistant failed to provide documents that did not exist or that were not relevant to the defense)[FN28]; *Brown v. Dotson, 2007 WL 1033359, at *3* (inmate facing disciplinary charges for writing a threatening note was not constitutionally entitled to DNA tests in connection with the hearing). This court concludes that, based on the Second Circuit's holding in *Ayers v. Ryan,* defendant Demars did not violate plaintiff's due process rights in connection with his rendering of assistance in connection with the hearing. In any event, Dep. Sup. Demars would be entitled to qualified immunity because he could not have reasonably understood, based on the uncertain controlling law in 2006, that his role in providing reasonable and adequate assistance to plaintiff, while serving as the hearing officer, violated plaintiff's due process rights.

>   FN28. *See also Clark v. Dannheim, 590 F.Supp.2d 426, 429-31 (W . D.N.Y.2008)* (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases).

## V. *Alleged Mail Tampering*

The First and Fourteenth Amendments to the U.S. Constitution are implicated when a prisoner's legal mail is obstructed, but a plaintiff must allege that the defendants' actions hindered the prisoner's "efforts to pursue a legal claim." *See Davis v. Goord, 320 F.3d 346, 351 (2d Cir.2003)* (citing *Monsky v. Moraghan, 127 F.3d 243, 247 (2d. Cir.1997).* In order to establish a claim that a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

prisoner's right of access to the courts has been abrogated, actual injury must be shown. *See Lewis v. Casey,* 518 U.S. 343, 351-52 (1996).

Prior to the Supreme Court's decision in Lewis, the Second Circuit had held that "an isolated instance" of interference with an inmate's legal mail delivery was insufficient to state a First Amendment claim, either with respect to the mail itself or with respect to access to courts, where "the infraction was not in accordance with official policy or practice and where no showing had been made that the inmate's right to access to courts was chilled .... " *Washington v. James,* 782 F.2d 1134, 1139 (2d. Cir.1986) (citation omitted). *Lewis* also suggests that the actual harm must be to direct or collateral attacks on the inmate's conviction, or to a challenge to the conditions of confinement. 518 U.S. at 355. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d at 352 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995)).

**\*14** Although the amended complaint alleges generally that plaintiff's mail was obstructed while he was in Franklin and Upstate,[FN29] his only focused claim of tampering with legal mail relates to an incident at Upstate in January 2007 involving defendants McCasland and Hoffnagle. (AC ¶¶ 29-33). During his deposition, plaintiff acknowledged that only two pieces of legal mail were opened outside of his presence, and that they may well have been opened by mistake or accident. (Dep. at 67, 74). Although the incident left Plaintiff "a little upset," he did not articulate how the opening and eventual loss[FN30] of the two items interfered with any pending legal matter. (Dep. at 71-75). Even accepting plaintiff's allegations as true, which the defendants dispute (McCasland Decl., Hoffnagle Decl.), the claim relating to the opening and possible destruction of two items of legal mail, without any showing of how plaintiff was prejudiced in a legal proceeding, does not support a viable First Amendment claim. *See, e.g., Morgan v. Montanye,* 516 F.2d 1367, 1370-71 (2d Cir.1975) (inmate's showing of only a single instance where clearly marked legal mail was opened out of his presence, in absence of any indication that the incident affected the correspondence between the inmate and his attorney concerning prisoner's criminal appeal or

any other legal matter, was insufficient to survive summary judgment).

FN29. The conclusory and general allegations of mail tampering are insufficient to overcome summary judgment, and do not identify particular defendants who were personally involved in the alleged violations. *See, e.g., Gilliam v. Quinlan,* 608 F.Supp. 823, 838 (S.D.N.Y.1985) (conclusory allegations of mail tampering insufficient to withstand summary judgment).

FN30. Plaintiff refused to accept the "opened" mail twice and then tried to recover it. By that time, the two items could not be located by DOCS, the post office, or the senders of the mail. Plaintiff alleges that defendant Hoffnagle and DOCS failed to return the mail to the sender pursuant to DOCS procedures. After an investigation, DOCS could not document what happened to the mail, but concluded that was no malfeasance of the part of the staff at Upstate. (Pl.'s Decl. ¶¶ 26-32, Ex. D, Dkt. No. 124-5 at 43-61).

## VI. *Retaliation Claims*

Plaintiff alleges that, in retaliation for his filing of a letter complaining of an assault of another inmate by correction officers, defendant Johnson filed a false misbehavior report against plaintiff, and defendant Gardner made inflammatory statements regarding plaintiff to other staff, prompting further acts of retaliation. Plaintiff characterizes, as retaliation, the subsequent "assaults" involving defendants Secore, Favro, Norcross, and Reardon; the conduct of the disciplinary hearing by defendant Demars; and the alleged mail tampering by defendants McCasland and Hoffnagle. For the reasons set forth below, this court will recommend that plaintiff's retaliation claims be dismissed, either on the merits or on qualified-immunity grounds.

### A. Applicable Law

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

**\*15** The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations. *Bennett,* 343 F.3d at 137 (citing *Dawes,* 239 F.3d at 491). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive, full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588-89 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself,

states a viable constitutional claim. *Id.*

**B. Application**

**1. First Amendment Protection**

The plaintiff alleges that various acts of retaliation resulted from a letter he wrote and signed, complaining about the assault of another inmate by correction officers. It is unclear, under Second Circuit authority, whether an inmate's complaints about the treatment of another inmate are protected by the First Amendment and, thus, whether they could be the basis of a retaliation claim. *See, e.g., Smith v. Greene,* 9:06-CV-0505, 2010 WL 985388, at \*3 (N.D.N.Y. Mar. 16, 2010) (it is far from certain whether the First Amendment protected an inmate's letter to the New York State Inspector General complaining about the use of force against a fellow inmate) (citing *Nevares v. Morrisey,* 95-CV-1135, 1991 WL 760231, at \*6 (S.D.N.Y. Sept. 27, 1999) (complaining aloud to correction officers about the treatment of another inmate is not constitutionally protected activity under the First Amendment)); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 339 (W.D.N.Y.2008) (it is unclear whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips,* 66 F.3d 470, 478-79 (2d Cir.1995) (an inmate has no clearly established First Amendment right to approach and complain to an officer about how he is disciplining another inmate). We will assume, for sake of argument, that plaintiff's complaint letter in this case was protected by the First Amendment. However, as discussed below, the defendants who allegedly took adverse actions against plaintiff based on this letter would be protected by qualified immunity because it was not clear under controlling law, in 2006 and 2007, that such conduct would violate plaintiff's First Amendment rights.

**2. Connection Between "Speech" and Alleged Adverse Actions**

**\*16** Plaintiff has alleged that the actions of nine different defendants between June 19, 2006 and January 2007 were carried out in retaliation for his letter of June 15, 2006. With two possible exceptions, plaintiff provides no support for the conclusory claim that these defendants

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

were even aware of his letter when they allegedly took adverse action against the plaintiff. It is unlikely that defendants Gardner, Secore, Favro, and Norcross, who were merely involved in plaintiff's move to the Franklin SHU on June 19th, were aware of plaintiff's letter, which was not received in the administrative office at Franklin until the following day. (Pl.'s Decl., Ex. A; Disc. Hearing at 52-53). To the extent these defendants were motivated to take some adverse action [FN31] against plaintiff, which they deny, the fact that plaintiff was just charged with creating some of the anonymous letters threatening the Franklin staff, would be a much more likely trigger.

FN31. Defendant Gardner's alleged statement on June 19th that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," would not support a retaliation claim because they would not deter an inmate of ordinary firmness in exercising his constitutional rights. *See, e.g., Davis v. Goord,* 320 F.3d at 353 (insulting, disrespectful, sarcastic, or hostile comments directed at an inmate generally do not rise to the level of adverse action) (citing, *inter alia, Dawes v. Walker,* 239 F.3d at 492 (calling inmate a "rat" not a constitutional violation). As noted above, this court rejected plaintiff's conclusory claim that this comment was an actionable incitement of defendants Secore and Favro to assault the plaintiff.

Plaintiff provides no support for the suggestion that defendant Reardon was aware of or motivated by plaintiff's June 15th letter when he allegedly used excessive force on June 24th. In fact, plaintiff provides a more plausible explanation for why defendant Reardon and the other SHU officers might be inclined to "assault" him on June 24th-plaintiff was refusing meals and generally acting like a "knucklehead" toward the staff. (Dep. at 63, 65). There is certainly no indication that defendants McCasland and Hoffnagle, correction officers at Upstate who allegedly tampered with plaintiff's mail in January 2007, knew of or were influenced by plaintiff's June 15, 2006 letter to officials at Franklin.

When he filed the disciplinary action against plaintiff on the afternoon of June 19th, defendant Johnson may not

have seen plaintiff's letter, which was not received by the administrative office until the following day. However, Lt. Johnson's inmate misbehavior report confirms that he was advised about plaintiff's prior contact with the Superintendent on June 17th, so there is some corroboration he was aware of at least the general contents of plaintiff's letter. Defendant Demars, the hearing officer at plaintiff's disciplinary hearing, was clearly aware of the June 15th letter, because plaintiff asked that it be made an exhibit.

However, plaintiff provides no information other than the temporal proximity between his June 15th letter and the conduct of defendants Johnson and Demars to suggest that the letter substantially motivated the alleged adverse actions by the prison officials. There is no indication of any contact between plaintiff and Lt. Johnson before the disciplinary charges were filed, and no evidence of any statements or prior conduct suggesting a retaliatory animosity on the part of either defendant. (Dep. at 19; Johnson Decl. ¶ 4). It is clear that plaintiff was identified as a possible suspect in the investigation of the anonymous threat letters because he expressed "similar concerns" to the Superintendent and in his June 15th letter. However, the disciplinary hearing transcript indicates that defendants Johnson and Demars were motivated by the goal of determining if plaintiff generated some of the anonymous threat letters, not the desire to retaliate against plaintiff for drafting and signing the June 15th letter (which contained complaints, but no threats). Given the record developed in connection with the pending summary judgment motion, plaintiff's conclusory allegations are not sufficient to establish that any of the nine defendants were substantially motivated by his June 15, 2006 letter in taking the actions they took. *See, e.g., Ayers v. Stewart,* 101 F.3d 687 (table), 1996 WL 346049, at *1 (2d Cir.1996) (given the weakness of his retaliation claim, plaintiff's reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment); *Crenshaw v. Herbert,* 445 F.Supp.2d 301, 305 (W.D.N.Y.2006) (because plaintiff offers nothing more than speculation that the moving defendants did what they did because he had filed a grievance, the temporal proximity between the protected activity and the adverse

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

action is not enough to give rise to a genuine issue of material fact); *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000)* (although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment).

## VII. *Deliberate Indifference to Medical Needs*

### A. Legal Standards

**\*17** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184.

### 1. Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id* . If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003)). However, in cases where

the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### 2. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839-40).

**\*18** In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

**B. Application**

**1. "Seriousness" of Plaintiff's Medical Condition and any Alleged Deprivation**

Plaintiff claims that, as a result of the alleged assaults on June 19 and 24, 2006, he suffered a "possible" fractured rib cage, dislocated jaw, and a torn tendon in his left armpit. (AC ¶¶ 14, 23). At his deposition in June 2009, plaintiff complained of continuing physical limitations because of a "torn ligament" in his armpit, as well as discomfort from a lump on his rib cage and a prior injury to his jaw. (Dep. at 80-81).

The record of the medical examinations of plaintiff by several health care providers over the days and weeks following the alleged assaults did not document the injuries claimed by plaintiff. (Secore Decl., Ex. B, Dkt. No. 110-11 at 8, 15, 18-19, 22-25; Medical Records at 25-36). In September and October 2006, PA Tichenor

evaluated plaintiff's claims of back, shoulder, and knee pain, and diagnosed plaintiff with a left shoulder sprain and then tendinitis of the left pectoralis major tendon. (Tichenor Decl. ¶¶ 8-10; Medical Records at 27, 31). When plaintiff was examined by a prison doctor in April 2008 regarding complaints of problems with his knees, feet, and arm, FN32 the physician detected a slight defect in plaintiff's "left bicep [?] tendon" that was "functionally insignificant" and did not effect his range of motion or strength. (Medical Records at 11; Dep. at 80). Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in a cell door. (Medical Records at 24). Hence, it is unclear whether the doctor's observations relating to the left arm in 2008 are related to the alleged assaults in June 2006 or the later incident.

> FN32. Even plaintiff does not relate medical problems beyond his jaw, rib cage, and left arm to the alleged assaults in June 2006 and related claims of deliberate indifference to those injuries. (Pl.'s Memo. of Law at 10-11; Dep. at 80-81). So, plaintiff's later claims of problems with his back, knees, and feet are not relevant to the evaluation of whether plaintiff had a "serious" medical condition to which the defendants were deliberately indifferent.

**\*19** A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; or (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03). Plaintiff's medical issues in June and July 2006 do not meet the objective standards of a "serious" medical condition. *See, e.g., Ninortey v. Shova,* 05 Civ. 542, 2008 WL 4067107, at *5, 16 (S.D.N.Y. Sept. 2, 2008)

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

(inmates's complaints of bruises, cuts, a twisted ankle, shoulder pain, a bloody mouth and cracked teeth following an alleged assault, much of which was not confirmed by records of frequent medical examinations and treatment, did not constitute a "serious medical condition"); *Evering v. Rielly,* 98 CIV. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001) (bruises, redness, soreness, a knot on the back, and a cut on the forearm are superficial injuries that require time to heal, but do not satisfy the objective component of the deliberate indifference standard); *Rodriguez v. Mercado,* 00 CIV. 8588, 2002 WL 1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (plaintiff who claimed to sustain bruises to his head, back, and wrist following an excessive force incident did not have a "sufficiently serious" medical condition); *Tafari v. McCarthy,* 2010 WL 2044705, at *20 (bruises and superficial lacerations resulting from an alleged assault did not satisfy the "serious medical condition" test).

Plaintiff complained that prison medical officials refused to examine or treat him for the injuries relating to the alleged assaults, particularly in June and July 2006. He alleges that, in the days following the assaults, his face and jaw were swollen and he was having difficulty breathing as a result of his rib cage; but does not claim he had more serious injuries or substantial, persistent pain. (AC ¶¶ 14, 17). Plaintiff denied any injuries on June 19th. (Davenport Decl., Exs. A & B). The prison medical records document that he was examined on several occasions by different providers in two facilities who found little evidence of the medical problems about which plaintiff complained.[FN33] Based on the defendants' declarations and the corroborating medical records, plaintiff's conclusory allegations about his denials of medical care would not, in this court's view, create an issue of fact. *See, e.g., Brown v. White,* 9:08-CV-200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record.); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (*citing*

*Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).[FN34]

FN33. The defendants' Memorandum of Law competently summarizes the conflict between plaintiff's claims and the declarations of the defendants and their contemporaneous medical records. (Defs.' Memo. of Law at 4-10, Dkt. No. 110-6).

FN34. *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

*20 However, plaintiff challenges the prison medical records that contradict his claims of injury and denied treatment, making conclusory allegations that various medical records were falsified and/or that his medical problems were mis-diagnosed. (AC ¶ 15; Pl .'s Memo. of Law at 3-13). It should be noted that the defendants' declarations and supporting medical records indicate that the plaintiff tried to manipulate care providers to document alleged injuries that the nurses did not detect.[FN35] Plaintiff's conclusory allegation that multiple medical professionals in two different prisons fabricated plaintiff's medical records to suppress evidence of his alleged injuries is highly suspect and would, in this court's view, also be insufficient to sway any rational fact finder. *See, e.g., Benitez v. Mailloux,* No. 9:05-CV-1160, 2009 WL 1953847, at *8 (N.D.N.Y. Mar. 25, 2009) (Treece, MJ) (plaintiff's conclusory contention that defendant falsified his ambulatory health care record is not enough to withstand summary judgment on his deliberate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

indifference claim), *report-recommendation rejected, in part, on other grounds,* 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (Mordue, DJ); *Liner v. Goord,* 115 F.Supp.2d 432, 435 (S.D.N.Y.2000) (dismissing conclusory claims that defendants conspired to tamper with and destroy plaintiff's medical records).[FN36]

FN35. Defendant Chesbrough states that he saw plaintiff on nurse's sick call at Upstate on July 13, 2006. "At that time the plaintiff stated he was injured on June 19th at Franklin and that he was not seen by a nurse. I asked him why he would waiting until now to report it. He stated, 'None of your business, just document it.' I again reviewed the medical record which indicated that the plaintiff was seen by an RN on 6/19/06." (Chesbrough Decl. ¶ 9; Medical Records at 32).

FN36. *But see* Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir.1984) (The records maintained by the prison officials and hospital do substantiate the conclusion that appellees provided Archer with comprehensive, if not doting, health care. Nonetheless, Archer's affidavit in opposition to the motion for summary judgment does raise material factual disputes, for example by alleging that defendants delayed her access to medical care at a time she was in extreme pain.); *Baumann v. Walsh,* 36 F.Supp.2d 508, 512-13 (N.D.N.Y.1999) (although records maintained by prison officials lend credence to [Defendant]'s version of events in that they show Plaintiff was provided with substantial medical care and treatment, Plaintiff's affidavits in support of summary judgment nonetheless raise material factual disputes, regardless of their likely resolution).

Even if plaintiff's conclusory attacks on the reliability of his medical records are not rejected, this court concludes that he did not suffer from a sufficiently "serious" medical condition or suffer a "serious" deprivation of medical care under Eighth Amendment standards. Plaintiff does admit that he received medical attention on several occasions in the months following the alleged assaults in June 2006. (Dep. at 48-57). He does

not take issue with the conservative treatment prescribed by PA Tichenor in the Fall of 2006. (Pl.'s Memo. of Law at 11; Tichenor Decl. ¶¶ 9-10). Even crediting only the medical evidence that plaintiff does not claim is fabricated,[FN37] there is no indication that alleged delays in his examination or treatment resulted in any substantial harm or required a dramatic change in the course of his treatment. *See, e. g., Evans v. Manos,* 336 F.Supp.2d 255, 261-62 (W.D.N.Y.2004) (delay in treatment of prisoner who claimed "extreme" back pain, which did not result in substantial harm to plaintiff or significantly change the course of his eventual treatment, was not a "serious" disruption of his medical care). *See also* Smith v. Carpenter, 316 F.3d 178, 188 (2d Cir.2003) (although demonstrable adverse medical effects may not be required under to establish an Eighth Amendment medical-care claim, the absence of subsequent physical injury will often be probative in assessing the risk of delaying treatment in the past).

FN37. Plaintiff credits, for example, the findings of the prison doctor in April 2008. (Dep. at 44-45, 80-81; Pl.'s Sur-Reply, Dkt. No. 129 at 7). As noted, the only injury that the doctor detected that could be related to the assaults in June 2006 was a possible defect in a tendon that was "functionally insignificant" and did not effect plaintiff's range of motion or strength. (Medical Records at 11). The doctor documented no residual evidence of the jaw and rib cage injuries that plaintiff still claimed to be suffering from as of the time of his deposition in June 2009. (Medical Records at 11; Dep. at 80-81). PA Tichenor, who examined plaintiff in 2006, also makes no notation of jaw or rib case issues. With respect to plaintiff's shoulder issues, defendant Tichenor found, in September 2006, that plaintiff's gait, range or motion, strength, and sensation were all normal. (Tichenor Decl. ¶¶ 8-11, Medical Records at 31). When PA Tichenor diagnosed plaintiff with tendinitis in his left arm in October 2006, he found the tendon was "tender but intact." (Medical Records at 27).

The record does not indicate that plaintiff was suffering from a serious medical condition which, even if

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

completely ignored in June and July 2006, would have created a serious risk to his health. Nor does plaintiff's subsequent medical history reveal that the alleged delay or denial of medical treatment had any adverse impact on plaintiff. Accordingly, this court concludes that summary judgment should be granted with respect to the plaintiff's medical care claims because no rational juror would find that plaintiff suffered a sufficiently serious medical condition or deprivation.

**2. "Deliberate Indifference"**

**\*21** The declarations of defendants Davenport, Volpe, Walsh, Chesbrough, and Tichenor, and the supporting medical records, also undercut plaintiff's conclusory allegations that they were deliberately indifferent to his medical needs. Based on the above analysis of plaintiff's medical condition in June and July 2006, plaintiff can not establish that the defendants recognized a serious risk to his health and deliberately ignored it. Given the court's finding that plaintiff has not established the objective elements of an Eighth Amendment medical care claim, a detailed analysis of the subjective element is not necessary. However, a few specific observations about two defendants are appropriate.

The only allegation against nurse Walsh in the amended complaint is that she refused to examine plaintiff on the day he was transferred to Upstate-July 12, 2006. (AC ¶ 23). The medical records indicate that nurse Chesbrough conducted plaintiff's intake examination of plaintiff on July 12th and saw him in sick call on July 13th. (Chesbrough Decl. ¶¶ 7-9; Medical Records at 32-34). [FN38] Even if defendant Walsh "refused" to examine plaintiff on July 12th, she apparently did so with the knowledge that he would be seen that day by another nurse. Such a claim cannot support a viable cause of action for deliberate indifference. [FN39]

> FN38. The plaintiff may be mistaken in his recollection of which nurse performed his intake examination at Upstate on July 12, 2009. (Dep. at 51-53).

> FN39. Even plaintiff's more pointed claims that defendants Davenport, Volpe, and Chesbrough refused to examine or treat him on one or more

occasions (Dep. at 41-42, 47, 49-50, 51-53) would not support a claim of deliberate indifference. *See, e.g., Savage v. Brue, 9:05-CV-857, 2007 WL 3047110 at \*9 (N.D.N.Y. Oct. 18, 2007)* (nurse refused pain medication to an inmate confined in a special housing unit for 48 hours with no mattress who complained of "extreme" back and neck pain due to a recent injury, and advised the inmate that he would need to "adjust to it"; while the nurse may have been negligent in her care, she was not reckless or deliberately indifferent); *Evans v. Manos, 336 F.Supp.2d at 261-62, 263* (terminating and postponing, for two more weeks, the medical appointment of a prisoner who claimed "extreme" back pain because he complained about his care did not constitute deliberate indifference where the doctor had no intention of doing the inmate harm).

Finally, plaintiff's Eighth Amendment claim against PA Tichenor is that he failed to detect or that he mis-diagnosed plaintiff's alleged injuries. (AC ¶ 25; Dep. at 44-45, 56-57, 80-81). [FN40] Based on the authority cited above, even if defendant Tichenor negligently mis-diagnosed plaintiff, that would not constitute "deliberate indifference."

> FN40. Plaintiff does dispute the number of times defendant Tichenor treated him, but does acknowledge he saw the physician assistant several times in 2006 and 2007. (Pl.'s Memo. of Law at 10-11).

**VIII. *Qualified Immunity***

Defendants argue that they are entitled to qualified immunity with respect to all of plaintiff's claims. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).* However, even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v.. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's Eighth Amendment claims against defendants Gardner, Davenport, Volpe, Walsh, Chesbrough, and Tichenor because, as discussed above, he has not established those alleged violations of his constitutional rights.

**\*22** Defendant Demars is entitled to qualified immunity with respect to the due process claim relating to his conduct of plaintiff's disciplinary hearing. As discussed above, the Second Circuit's decisions in *Taylor v. Rodriguez,* 238 F.3d at 194 and *Luna v. Pico,* 356 F.3d at 489-90 did not clearly impose a due process requirement that a hearing officer at a prison disciplinary hearing perform independent analysis of lay handwriting comparisons made by a testifying witness. If the controlling authority were subsequently construed to require such independent analysis in the context of this case, this court finds it would not have been clear to defendant Demars in 2006 that his reliance on the witness' handwriting comparisons violated plaintiff's due process rights. <sup>FN41</sup> Similarly, the court concluded that the controlling authority in this circuit did not clearly prohibit a hearing officer at a prison disciplinary proceeding from also providing required assistance to the charged inmate. *Ayers v. Ryan,* 152 F.3d at 81. Because defendant Demars could not have reasonably understood that he could be violating plaintiff's due process rights by effectively providing assistance at the hearing over which he presided, he is entitled to qualified immunity with respect to that claim.

FN41. *Cf. Luna v. Pico,* 356 F.3d at 491 (defendant is protected by qualified immunity because a reasonable hearing officer would not have clearly understood from *Taylor* and other then-existing law that an independent review of the credibility of a non-testifying victim was required by due process).

To the extent a higher court were to determine that any defendant who took adverse action against plaintiff was substantially motivated by plaintiff's June 15, 2006 letter complaining about the beating of another inmate, that defendant would be protected by qualified immunity with respect to a retaliation claim. As of 2006 and early 2007, the controlling authority in this circuit did not clearly provide First Amendment protection to complaints by one inmate about the alleged mistreatment of another inmate. *See, e.g .,* *Pettus v. McGinnis,* 533 F.Supp.2d at 339 (defendant is entitled to qualified immunity because of the uncertainty as to whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips,* 66 F.3d at 479.

As to plaintiff's excessive force and failure to intervene claims against defendants Secore, Favro, Norcross, and Reardon, it was clearly established, as of the time of the alleged incidents in June 2006, that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. *See, e.g., Hudson,* 503 U.S. at 9-10. Thus, accepting all of plaintiff's allegations about the two incidents on that day as true, qualified immunity cannot be granted to those defendants, because a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation. *See, e.g., Dallio v. Sanatamore,* 2010 WL 125774, at \*14.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' summary judgment motion be **DENIED IN PART,** as to (1) plaintiff's Eighth Amendment claims based on excessive force and/or failure to intervene against defendants Secore, Favro, and Norcross and (2) the Eighth

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3785771 (N.D.N.Y.)

(Cite as: 2010 WL 3785771 (N.D.N.Y.))

Amendment claims based on excessive force against defendant Reardon. And, it is further

**\*23 RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 110) be **GRANTED IN PART,** and that the complaint be dismissed in its entirety as to the remaining claims against all defendants.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2010.

Lewis v. Johnson
Slip Copy, 2010 WL 3785771 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3762016 (N.D.N.Y.)

(Cite as: 2010 WL 3762016 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Marc LEWIS, Plaintiff,
v.
J. JOHNSON, et al., Defendants.
No. 08-CV-0482.

Sept. 20, 2010.
Marc Lewis, Comstock, NY, pro se.

Christina L. Roberts-Ryba, New York State Attorney
General, Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.
**\*1** This matter brought pursuant to 42 U.S.C. § 1983
was referred to the Hon. Andrew T. Baxter, United States
Magistrate Judge, for a Report-Recommendation pursuant
to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

No objections to the August 5, 2010
Report-Recommendation have been raised. After
examining the record, this Court has determined that the
Report-Recommendation is not subject to attack for plain
error or manifest injustice. Accordingly, this Court adopts
the Report-Recommendation for the reasons stated therein.

It is, therefore, **ORDERED** that Defendants' motion
for summary judgment (Dkt. No. 59) is **DENIED** as to (1)
Plaintiff's Eighth Amendment claims based on excessive
force and/or failure to intervene against defendants
Secore, Favro, and Norcross; and (2) the Eighth
Amendment claims based on excessive force against
Defendant Reardon. In all other respects, Defendants'
motion for summary judgment is **GRANTED** and the
Complaint is dismissed in its entirety as to all other claims

against all defendants.

IT IS SO ORDERED.

N.D.N.Y.,2010.

Lewis v. Johnson
Slip Copy, 2010 WL 3762016 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.